Barbara Nava **BARRIENTOS,**
Appellant,

v.

Josie Moreno **NAVA, Appellee.**

No. 14–01–00459–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Dec. 5, 2002.

Eileen F. O'Neill, Houston, for appellant.

Sally S. Andrews, Houston, for appellee.

Panel consists of Justices HUDSON, FOWLER, and MURPHY.*

## OPINION

WANDA McKEE FOWLER, Justice.

This is a dispute about money and who will control the money. The money was

---

* Senior Chief Justice Paul Murphy, participating by assignment.

from two accounts owned by Reno Nava: a retirement account and a life insurance policy. When Reno died, his ex-wife, Josie, wanted control of these funds to replace child support Reno was supposed to—but did not—provide for the children. Reno's sister, Barbara, claimed that Reno made her trustee of these funds for his two children and that she should control them. Barbara appeals from a judgment in which the family law judge held that she could no longer control the funds and made Josie trustee over the funds. In this appeal, we address three broad issues. First, we consider whether the family court had jurisdiction over the subject matter, parties, and property. Second, we discuss three trust issues: (a) whether Reno created trusts over these two accounts, (b) whether Barbara was properly removed as trustee, and (c) whether Josie was properly substituted as trustee. Third, we weigh Barbara's claim that the trial court was improperly biased. We find that (1) the court had jurisdiction over the initial support issues brought before it and that it had jurisdiction as a district court over the additional party and property brought before it, (2) Reno Nava did create trusts and that Barbara was properly removed as trustee and Josie properly substituted, and (3) the court was not improperly biased. Consequently, we affirm the judgment of the court, with some modifications.

## I. Factual and Procedural Background

### A. Factual Background

Josie and Barbara are former sisters-in-law. Josie was married to Barbara's brother, Reno Nava. Josie and Reno had two children, Tyler and Brooke. In 1995, Josie and Reno were divorced. At the time of the divorce, Reno had a $50,000

insurance policy with the Knights of Columbus (the "KOC" policy). The final divorce decree obligated Reno to pay Josie child support for the children and to maintain, as additional child support, the $50,000 KOC life insurance policy, naming the children as beneficiaries and Josie as trustee.[1]

Reno did not comply with the decree's order to name his children beneficiaries of the KOC policy; instead, he named his mother, Margaret Nava, and his father as the beneficiaries. Josie was unaware of this. It was her understanding that Reno "had taken care of the matter." She was also reassured by a copy of a 1993 designation form naming her and Tyler as beneficiaries of the KOC policy.

In addition to the KOC policy, Reno had retirement benefits with the Texas County and District Retirement System (the "TCDRS annuity"). Although the record does not include the specific order, the divorce decree undisputedly provided that Reno retained 100% of those benefits after the divorce. After the divorce, Reno also acquired a $15,000 life insurance policy with Blue Cross/Blue Shield (the "BCBS policy").

The designation forms for both the TCDRS annuity and the BCBS policy named Reno's sister Barbara as "trustee" for the beneficiaries, Tyler and Brooke.

In August of 1997, Reno died of brain cancer. Several days after his funeral, a KOC insurance agent met with Reno's sister, Barbara, and his mother, Margaret, at a restaurant. There, Barbara learned that Margaret was designated as a beneficiary of the KOC policy proceeds. In fact, during the meeting, Margaret filled out a form to claim the proceeds. The KOC policy

1. The decree also provided that Reno's child support obligations would not terminate on his death.

proceeds were paid to Margaret in September,[2] and she quickly spent most of the money on herself.

After Reno's death, Josie and Barbara spoke frequently over the phone about the TCDRS annuity, worth approximately $20,000, and the BCBS policy. Because Barbara was handling those funds, Josie assumed Barbara was also handling the KOC policy.

Josie did not learn that Margaret was designated as the beneficiary of the KOC policy until early December 1997. When Josie specifically asked Barbara about the policy, Barbara stated only that Josie would have to speak to Margaret about it. Barbara did not tell Josie about the meeting with the KOC agent or that Margaret had claimed the benefits. Shortly thereafter, Josie discovered that Margaret had already spent half of the money. At a Christmas party Barbara hosted for Tyler and Brooke, Josie showed Barbara the divorce decree and told her, Margaret, and another sister of Reno's, Janet, that she believed the $50,000 belonged to the children. Margaret and the sister then left, and Josie and Barbara agreed that Barbara would be the "mediator" to resolve the matter and obtain the return of the children's money. However, when Josie telephoned Barbara in the weeks following the party, Barbara told her that she was unable to contact Margaret. Barbara then dropped the matter, and made no further effort to assist Josie.

Unable to resolve the matter through Barbara, Josie sued Margaret to recover the KOC policy benefits. Josie later added Barbara and her sister, Janet, as defendants. By the time the remaining benefits were located, only $10,000 was left. Josie eventually settled with Margaret and Janet, and proceeded to trial against Barbara.

### B. PROCEDURAL HISTORY

The case was tried to the court without a jury. At trial, Josie argued that Reno attempted to designate Barbara as "trustee" for the children on the BCBS policy and the TCDRS annuity, but that he was unsuccessful and did not create valid trusts. She claimed she was entitled to the funds as equitable relief to replace the loss of the $50,000 KOC policy that was intended to be additional child support. In the alternative, she argued that Barbara should be removed as trustee because she was not competent to manage the trust funds, and she had acted with such hostility toward Josie that it interfered with her ability to properly perform her duties as trustee.

### C. THE JUDGMENT AND FINDINGS OF FACT

The trial court ruled in favor of Josie, and entered a judgment ordering that "[w]hatever the legal status of the alleged trust[s] may be," Barbara be removed as trustee and all proceeds of the BCBS and TCDRS funds be delivered to Josie as trustee for the minor children, Tyler and Brooke. The judgment also recited that "[t]here is evidence before the Court that Barbara Nava Barrientos . . . has dealt in hostility and bad faith."

The trial court also issued numerous findings of fact and conclusions of law. The relevant findings of fact are summarized as follows: (1) according to the divorce decree, Josie was entitled to receive the proceeds of the KOC policy as child support and be named "trustee for the benefit of the children"; (2) in failing to change the beneficiary on the KOC policy, Reno did not comply with the divorce decree, and, moreover, he falsely represented to Josie that he had changed the beneficiary designation; (3) Reno made the false representations to deceive Josie and pre-

---

**2.** Reno's father pre-deceased him, so the pro- ceeds were paid solely to Margaret.

vent her from applying to the court for enforcement of the divorce decree's requirement that the beneficiary be changed; (4) Barbara participated in a restaurant meeting with the Knights of Columbus insurance agent and knew there was an issue regarding the beneficiary designation; (5) Barbara "deliberately misled Josie" about the KOC policy while Margaret spent all but $10,000 of the proceeds, and was part of the fraud against Josie; (6) at the time of Reno's death, the beneficiaries of the BCBS and TCDRS funds were the minor children, Tyler and Brooke Nava, with Barbara as trustee of the funds for their benefit, (7) Barbara "made no reasonably prudent decisions" about investing the proceeds, was unable to state how she would invest the proceeds, showed no ability to administer the proceeds to the best interests of the children, and showed a lack of appropriate investment knowledge; and, lastly, (8) Josie was "business-like," had knowledge of appropriate investments, and generally had demonstrated her capability to invest the monies on behalf of the children.

The trial court also found that "Josie Moreno Nava has not shown hostility to Barbara Nava Barrientos, but Barbara Nava Barrientos has shown such hostility that (a) Barbara Nava Barrientos' administrative plans (or lack thereof) for the [BCBS policy and the TCDRS annuity] have been affected, and (b) Barbara Nava Barrientos has not been able to think and act as a fiduciary should...." Accordingly, the trial court found that it was in the best interests of the children that Barbara be removed as trustee and Josie receive the BCBS and TCDRS funds directly as trustee for the minor children.

In accordance with additional findings that there were no definite trust terms, the trial court also entered conclusions of law that Reno's designation of Barbara as "trustee" of the BCBS and TCDRS funds was not sufficient to create a trust, the trust failed for lack of definiteness, and the funds were not trust funds. However, the court also concluded it had the equitable power and authority to remove Barbara as trustee and name Josie as trustee, in order to partially compensate Josie for the loss of the KOC policy proceeds and put her and the children in "as close a position as possible to where they would have been" had Reno complied with the court's divorce decree regarding the KOC policy.

This appeal followed.

## II. Issues Raised on Appeal

Barbara raises thirty-four issues on appeal. They fall into three categories: jurisdictional issues, trust issues, and improper bias of the trial court.

The overarching jurisdictional claim involves both an attack on the court's subject matter and in personam jurisdiction, and a claim that the court could not take any action regarding the retirement policy and annuity because Reno's estate was a necessary party to the action but was not joined.

After discussing the jurisdictional issues we will turn to the trust issues. Three general trust issues exist: (1) whether a trust was created; (2) the removal of Barbara as trustee; and (3) the substitution of Josie as trustee.

The third and last issue is whether the trial court was swayed by improper bias against Barbara.

### A. The Jurisdictional Issues

Josie filed her lawsuit against Margaret, and, later, Barbara and Janet, in the family court that adjudicated Josie and Reno's divorce. In her petition, she alleged that jurisdiction was proper based on the court's continuing jurisdiction to enforce the provisions of the divorce decree and its pendent and ancillary jurisdiction over re-

lated issues. She also alleged the court had jurisdiction over matters involving trusts. On appeal, Barbara contends that the trial court (1) lacked jurisdiction because this was strictly a property issue and not a support issue, (2) lacked jurisdiction to adjudicate any part of the case because Reno's estate was not made a party to the dispute, and (3) lacked jurisdiction over Barbara[3] because she was not a party to the divorce. Before we can address these claims, we must first review the family court's general jurisdiction. After that, we will weigh each claim in turn.

### 1. A Review of the Family Court's Specific and General Jurisdiction

Continuing, exclusive jurisdiction is acquired—and retained—by a court when it renders a final order in an original suit affecting the parent-child relationship. TEX. FAM.CODE ANN. §§ 155.001(a), 155.002. Once a court has acquired continuing, exclusive jurisdiction, no other court can obtain jurisdiction, unless the case is appropriately transferred or there is an emergency. *Id.* §§ 155.001(c), 155.201–.207 (transfer provisions), 262.002 (jurisdiction for emergency proceedings). And, the Family Code also gives the family court continuing jurisdiction to modify its support orders. TEX. FAM.CODE ANN. § 155.003(a). Additionally, the Family Code liberally provides for joinder of claims in a suit affecting the parent-child relationship. TEX. FAM.CODE ANN. § 157.003(a) (allowing for joinder in the same proceeding of any claim and remedy provided for under the Family Code or "other rules of law"); *see also Moore v. Sanders*, 106 S.W.2d 337, 338 (Tex.Civ. App.-San Antonio 1937, no writ) (finding

that suit to remove trustee and suit to make allowances from corpus of trust for maintenance of beneficiaries were properly joined).

■ In addition, Texas law greatly discourages the multiplicity of suits, preferring that all disputes between the parties over the same subject matter be settled in one suit. This general doctrine is recognized in all existing systems of jurisprudence, but applied in Texas with particular force. *See Moore*, 106 S.W.2d at 338.

### 2. This was a Valid Exercise of the Family Court's Continuing, Exclusive Jurisdiction

We start with the proposition that the family district court had authority to modify the child support orders contained in the original divorce decree. We now consider whether Barbara has presented a valid reason why the court could not exercise its continuing, exclusive jurisdiction.

Barbara complains that the trial court did not have jurisdiction for three reasons. First, this was a suit involving property division, and the court had lost its jurisdiction to divide property of the marital estate. Second, Reno's estate was not made a party to the suit, so the court did not have authority over the property. Third, the court had no continuing jurisdiction over Barbara, Margaret, or the two trusts because neither the property nor the persons were part of the divorce proceedings. We will address each of these claims.

### a. This was not a suit for property division

■ First, Barbara claims this is a suit involving property division. We have re-

---

**3.** The actual claim is that the court did not have jurisdiction over Margaret, Barbara or Janet, but Margaret and Janet, having settled with Josie before trial, are no longer parties

and not involved in this appeal. As a result, we will consider this claim as it relates to Barbara.

viewed the petition and we disagree. The petition clearly sets forth that Josie brought suit because Reno failed to designate his children the beneficiaries of a life insurance policy. As alleged in the suit, the policy was to provide them $50,000 in child support upon his death. Consequently, this suit was brought to replace child support that was lost when Reno violated the court's order regarding support. Moreover, as noted earlier, initially, Josie sued only Margaret over the KOC policy. She requested a temporary restraining order and temporary injunction enjoining Margaret from wasting the KOC assets, noting that the KOC policy was designated as child support for the children. Clearly, the court had continuing exclusive jurisdiction over this child support claim. TEX. FAM.CODE ANN. § 155.002; *Fleming v. Easton*, 998 S.W.2d 252, 254 (Tex.App.-Dallas 1999, no pet.).

But, even if the court may have continuing exclusive jurisdiction over the child support, Barbara claims that the court did not have power to exercise jurisdiction because (1) Reno's estate was not brought into the suit before the family court; and (2) Margaret, Barbara; and the BCBS policy and TCDRS annuity were not parties to or part of the divorce proceedings.

### b. No proof that Reno's estate (if there was one) was a necessary party

■ Barbara is right that Reno's estate was not made a party to the action. However, the record does not contain evidence that an estate was probated or, if so, who its representative was. The record contained some evidence that Reno died intestate; the record contains no evidence that there was an administration of the estate, nor any evidence that an application of any kind was filed in probate court. *See* TEX. PROB.CODE ANN. § 178(b) ("No administra-

tion of any estate shall be granted unless there exists a necessity therefor, such necessity to be determined by the court hearing the application."). Barbara does not maintain that there was an administrator who should have been joined or otherwise claim that a particular person could represent the estate. Moreover, when the case was tried to the court, there was no showing that the estate was in a probate court, that any individual was granted a letter of administration, or that any other person should be a party. Consequently, the record supports the conclusion that the court had before it the only people who had any interest in the proceedings or assets: Margaret Nava, Reno's mother, who was wrongly designated beneficiary of the KOC policy; Barbara, the only person other than the children who had any interest in the BCBS and TCDRS funds; the children; and Josie. We overrule Barbara's claim that the court needed to have any additional parties in court before it had jurisdiction over the property and parties.

### c. The court had jurisdiction over Barbara and the two accounts

■ Finally, we turn to Barbara's claim that the court did not have jurisdiction over her or the properties (the BCBS policy or the TCDRS annuity), neither of which were subject to the divorce decree. She claims that the court overreached when it exercised jurisdiction over her and this property.

At first glance, it may seem that the court overreached for the reason Barbara alleges. Barbara was not a party to the divorce, and neither of the two funds was designated as child support in the divorce decree. In fact, the BCBS policy was purchased after the divorce. However, for two reasons, we believe the Family Code supports jurisdiction here. First, the

Code provides that the court has continuing exclusive jurisdiction over child support issues. TEX. FAM.CODE ANN. § 155.001–155.003. This suit initially involved a child support obligation that Reno did not fulfill. No other court would have had jurisdiction to resolve that child support issue. *Id.* In fact, the concept that a family court continues its jurisdiction over support issues is so strong that even if a family court loses its continuing, exclusive jurisdiction to modify its order regarding support, it still retains the power to enforce its order for violations that occurred prior to the time it lost continuing, exclusive jurisdiction. *Id.* § 155.004. Consequently, with the filing of the original petition for injunction, declaratory judgment and damages, the family court had authority to hear the case. Barbara and the accounts at issue here were not joined until after the family court had already acquired jurisdiction over the case. Josie's claims against Barbara and this property were based on an attempt to recoup the lost child support and, factually, were intimately connected with the original suit. Moreover, although Josie maintained that these properties were not trusts for her children, clearly the children were mentioned in the accounts and were the apparent beneficiaries. Thus, from a practical perspective and in furtherance of judicial economy, if there was a dispute about these accounts, it made sense for the court to hear these issues with the others it had before it.

It also made sense legally for the court to hear and decide these issues, which leads us to the second reason the trial court had authority. As a court of general jurisdiction in which family matters merely take precedence, the family district court was clearly permitted to hear and decide the trust issues in this case. *See* TEX. GOV'T CODE ANN. § 24.601(a) ("A family district court has the jurisdiction and power provided for district courts by the constitution and laws of this state."); TEX. PROP.CODE ANN. § 115.001(a)(3) ("[A] district court has original and exclusive jurisdiction over all proceedings concerning trusts, including proceedings to appoint or remove a trustee."); TEX. PROB.CODE ANN § 5(e) ("A statutory probate court has concurrent jurisdiction with the district court . . . in all actions involving an inter vivos trust . . . .").

Consequently, the court had jurisdiction to resolve the support issue initially brought before it; the court also had jurisdiction to resolve the trust issues which later arose. Barbara was a necessary party to the trust issues and to the support issues, and therefore the court had jurisdiction over her.[4]

We have read the cases Barbara cites in support of her claim that the court did not have jurisdiction. *See Peirce v. Sheldon Petroleum Co.*, 589 S.W.2d 849 (Tex.Civ. App.-Amarillo 1979, no writ); *Qwest Microwave, Inc. v. Bedard*, 756 S.W.2d 426 (Tex.App.-Dallas 1988, no writ). Neither case involves child support orders or the family court's broad powers and continuing exclusive jurisdiction to hear matters. *Peirce* was brought in a civil district court and involved business transactions; *Qwest* was a probate proceeding that also involved business transactions. Because these cases were not brought in a family

---

4. Because of the unique circumstances of this case, the court's jurisdiction does not depend on Barbara's presence as a party to the divorce proceeding. Moreover, because of the support issue, only the family court had jurisdiction to hear all of the issues together. Neither a civil district court nor a probate court could hear the support issue. So, our policy of promoting judicial economy also supports a conclusion that the family court should hear the whole case.

court that had jurisdiction over the child support issue and the ensuing trust issue, and because they do not involve child support issues, they are distinguishable and not noteworthy for our purposes.

In summary, we overrule Barbara's first issue alleging that the court lacked jurisdiction over the property and the parties.

## B. THE TRUST ISSUES

Having determined that the trial court had jurisdiction over this case, we now consider the trust issues in the case. First, was a trust created? Under this section we will discuss (a) the particular designations Reno made, (b) how a trust is created and what type of trust this was, and (c) whether the trust was vague in one of several ways. Under this third part, we will also review and distinguish cases Josie cites. Second, we will consider whether the court properly removed Barbara as "trustee." Third, we will review the court's appointment of Josie as trustee.

### 1. Was a Trust Created?

#### a. The designations Reno made

Before discussing the trust issues, we will first review the designations Reno made in the two accounts. Understanding how the designations were written on the forms helps clarify our later discussion. Reno made two designations that are at issue here. The first is contained in the BCBS policy. That form contains a line for the insured to designate a "primary beneficiary." It asks for the beneficiary's full name, the beneficiary's relationship to the insured and the beneficiary's date of birth. Reno filled out this line in the following way. On the top half of the space Reno wrote "Barbara Nava Barrientos." The bottom half of the space contained this information: "Trustee for minor children Tyler & Brooke Nava Children 7–17–92 Tyler 2–16–94 Brooke."

The TCDRS beneficiary form asked for the same information plus an address. Reno filled out this form with the same information as the BCBS policy plus an address that appears to have been his.

#### b. Creation of a trust

##### (1) *The relevant law*

■ The Texas Trust Code states that a trust may be created in one of five ways: (1) a property owner's declaration that the owner holds the property as trustee for another person; (2) a property owner's inter vivos transfer of the property to another person as trustee for the transferor or a third person; (3) a property owner's testamentary transfer to another person as trustee for a third person; (4) an appointment under a power of appointment to another person as trustee for the donee of the power or for a third person; and (5) a promise to another person whose rights under the promise are to be held in trust for a third person. TEX. PROP.CODE ANN. § 112.001.

■ No particular form of words is required to create a trust. However, to create a trust a document must be reasonably certain as to the putative trust's property, its object, and the beneficiary. *Colton v. Colton*, 127 U.S. 300, 310–11, 8 S.Ct. 1164, 1168–69, 32 L.Ed. 138 (1888); *Tomlinson v. Tomlinson*, 960 S.W.2d 337, 338 (Tex.App.-Corpus Christi 1997, pet. denied) (citing *Fred Rizk Const. Co. v. Cousins Mortg. & Equity Invs.*, 627 S.W.2d 753, 757 (Tex.App.-Houston [1st Dist.] 1981, writ ref'd n.r.e.) and *Kurtz v. Robinson*, 279 S.W.2d 949, 952 (Tex.Civ.App.-Amarillo 1955, writ ref'd n.r.e.)). We look to the settlor's intent to determine whether a trust was created. *See* TEX. PROP. CODE ANN. § 112.002 ("A trust is created only if the settlor manifests an intention to create a trust.").

The dispute here centers on two issues. First, do the designations fall under one of the five methods of creating a trust and, second, even if they do fall under one of the five categories, does the trust fail for vagueness? Both parties seem to agree that, if any of the categories apply here, only the inter vivos transfer applies.

### (a) *This was an inter vivos transfer*

Barbara maintains that Reno's designations on his insurance and benefit forms were inter vivos transfers of property; Josie claims that they were not. To resolve this issue, Barbara has cited us to *Tomlinson v. Tomlinson*, whose facts are very close to ours. In *Tomlinson*, like here, the father listed his children as designated beneficiaries of his death benefits from a company profit sharing plan. *See Tomlinson*, 960 S.W.2d at 337–38. Like here, father designated his sibling trustee for the death benefits. *See id.* at 338. Like here, aside from this designation on his profit sharing plan form, there is no other trust instrument. *See id.* With very little explanation, the court concluded that the designation was an inter vivos transfer. *See id.* Josie claims that we should consider *Tomlinson* an aberration in Texas law and refuse to follow it. For the following reasons, we decline to treat *Tomlinson* as an aberration.

Although there is very little in Texas law to guide us on this issue, several Trust Code provisions contemplate that death benefits and life insurance proceeds are appropriate trust property. In the definitions section for trusts, "property" means "any type of property ..., including a contractual right to receive death benefits as designated beneficiary under a policy of insurance, contract, employees' trust, retirement account, or other arrangement." TEX. PROP.CODE ANN. § 111.004(12). In a later section, death benefits are again specifically mentioned as being transferable to a trust: "A death benefit is payable to a trustee of a trust evidenced by a written instrument or declaration existing on the date of an employee's ... death, ... if the trustee is designated as beneficiary ... under the retirement account." TEX. PROP. CODE ANN. § 121.052(a).

The Restatement (Second) of Property also specifically recognizes the designations that Reno made as inter vivos transfers. *See* RESTATEMENT (SECOND) OF PROPERTY § 32.4 (1990). As the Restatement (Second) explains, these types of transactions are considered will substitutes. *See id.* For example, when life insurance is owned by the insured, and he directs the insurance company to pay the insurance proceeds on his death outright to either a named person or the trustee of a trust, "the pay-out arrangement, though revocable by the insured, is an inter vivos donative document of transfer that is a substitute for a will." *See id.* cmt. f. The Restatement (Second) of Property also recognizes an employee death benefit designation as an inter vivos donative document of transfer. *See id.* cmt. h ("The designation by the employee of the person or persons to receive such benefits on the death of the employee, though revocable by the employee, is an inter vivos donative transfer and is a substitute for a will.").[5]

---

5. A tentative draft of the Restatement (Third) of Property also recognizes that designations of beneficiaries on life insurance policies and employee benefit accounts are inter vivos donative transfers. *See* RESTATEMENT (THIRD) OF PROPERTY § 7.1 & cmts. a, c, d (Tentative Draft No. 3, 2001). As that document states, designations like those here "effect a present transfer of a nonpossessory future interest or contract right, the time of possession or enjoyment being postponed until the donor's death." *See id.* cmt. a.

We conclude that the designations on the BCBS and TCDRS forms were inter vivos donative transfers and thus a recognized method of creating a trust.

### (2) *The designations were not too vague*

Having concluded that these were inter vivos donative transfers, we now turn to the second half of our question—whether the trust failed for vagueness. Again, as we explain below, we agree with the *Tomlinson* court that the designations do not fail for vagueness because (1) the designations are clear as to who the beneficiaries are and (2) the unique circumstances of this relationship and the property code provide sufficient details to overcome a vagueness claim. Finally, we will review the cases Josie cited and explain why they are not controlling here.

### (a) *The designations of the beneficiaries were not too vague*

█ The designations are clear that Reno was designating his children as beneficiaries and Barbara as a mere trustee. The designation forms asked for specific information on the beneficiaries, such as relationship to the donor, date of birth and gender. On both the forms, the responses to these questions gave information on the children, not on Barbara. Only Barbara's name, followed by the word "trustee," appears on the forms. No other information about Barbara is given. Thus, it seems unmistakable that Reno intended Barbara to hold the property in trust for the intended beneficiaries—Reno's two children.

### (b) *The purpose of the trust is not too vague*

█ That leaves us to determine whether sufficient details on the purpose of the trust and the duties of the trustee exist so that the trust does not fail for vagueness. In this situation, with minor children, we think it very reasonable to conclude that Reno intended the money to be used for the general welfare of his children, which could include both daily maintenance and special expenditures.

Moreover, the Trust Code supplies additional details so the trustee can act and can be held accountable for her actions. Section 113.006 of the Code gives the trustee the authority to manage trust property and invest and reinvest the funds on the conditions and for length of time as the trustee sees fit. TEX. PROP.CODE ANN. § 113.006. Section 113.021 authorizes the trustee to distribute funds from the trust to minors. *Id.* § 113.021. Section 113.056 requires the trustee to exercise the judgment and care that persons of ordinary prudence, discretion, and intelligence exercise in their own affairs regarding permanent funds. *Id.* § 113.056. Finally, section 114.001 holds the trustee accountable to the beneficiary for the trust property. *Id.* § 114.001. Consequently, under the Trust Code, the trustee is authorized to manage the property and to distribute funds to the minors, and must exercise judgment in fulfilling her duties.

### (c) *Cases cited by Josie are distinguishable*

We are mindful of the cases cited to us by Josie that strike down trusts for vagueness, but none of these cases involve a trust for minor children. *City of Wichita Falls v. Kemp Pub. Library Bd. of Trustees* involved the Wichita Falls public library and its board of directors, who disagreed with the city manager regarding the use of the city's tax levies for the library. 593 S.W.2d 834, 835–36 (Tex.Civ.App.-Fort Worth 1980, writ ref'd n.r.e.). The court held that the trust was too vague for the Board to have the power to control public funds. *Id.* In *Costello v. Hillcrest State*

*Bank of Univ. Park,* a husband took title to his wife's homestead as Jim Costello, trustee, without any mention of a beneficiary. 380 S.W.2d 780, 780 (Tex.Civ.App.-Dallas 1964, no writ). The court held that there was no trust and the mere use of the word "trustee" did not make Costello a trustee. *Id.* at 782. In *Otto v. Klement,* Otto and his adult sister jointly held a checking account, a savings account, and a certificate of deposit made payable to the sister and Otto, "Trustee." 656 S.W.2d 678, 679 (Tex.App.-Amarillo 1983, writ ref'd n.r.e.). At the sister's death, Otto's brothers and sisters claimed that he held the money in trust for them. The court held that, under the circumstances, when the language was reasonably susceptible of more than one meaning, mere use of the word "trustee" did not create a trust. *Id.* at 682–83. Thus, of the cases Josie cited, we have (1) a board of directors of a rather vague private trust that claimed the right to decide how to spend public funds, (2) a deed of trust on a homestead property listing the husband as trustee without naming a beneficiary, and (3) a certificate of deposit, owned jointly by an adult brother and sister, that listed the brother as trustee without naming a beneficiary. In contrast, here, we know the corpus, we know the beneficiaries, and we know with reasonable certainty the purpose of the trust—the care and welfare of the minor children.

We see no reason why this sort of transaction should not create a trust; especially in the case of a divorced parent who may not want an ex-spouse to have complete control over money. Moreover, for someone who is unsophisticated or does not have the financial resources to pay a lawyer to set up a trust, this provides a relatively straightforward way of providing for minor children without court involvement.

In short, we sustain Barbara's second point that the trial court erred in holding that no trust was created by these two accounts.

## 2. The Removal of Barbara as Trustee

■ We next turn to Barbara's claims that the court erred in removing her as trustee. As noted above, a district court has original and exclusive jurisdiction over all proceedings concerning trusts, including proceedings to appoint or remove a trustee. *See* TEX. PROP.CODE ANN. § 115.001(3). In twenty-two points of error related to the trial court's removal of Barbara as trustee, she complains that the evidence was legally and factually insufficient to support her removal under the specific grounds enumerated in section 113.082 of the Texas Trust Code or for "other cause" as provided in the statute.[6]

### a. The law governing the removal of a trustee and the standard of review

Section 113.082 governs the removal of a trustee and provides in pertinent part as follows:

> (a) A trustee may be removed ... on the petition of an interested person and after hearing, a court may remove a trustee ... if:

6. Barbara's complaints are primarily directed to findings relating to fraud, bad faith, hostility, and Barbara's ability to administer the trust. Barbara contends that there is legally and factually sufficient evidence to support certain findings, certain findings are immaterial, and certain of the trial court's conclusions of law are erroneous. We need not address each issue separately; rather, we determine whether the evidence is sufficient to support the trial court's judgment removing Barbara and substituting Josie as trustee. *See Moore v. Sanders,* 106 S.W.2d at 339 (declining to address appellant's theories individually in action to reverse her removal as trustee).

(1) the trustee materially violated or attempted to violate the terms of the trust and the violation or attempted violation results in a material financial loss to the trust;

(2) the trustee becomes incompetent or insolvent; or

(3) in the discretion of the court, for other cause.

Tex. Prop.Code Ann. § 113.082(a).

■ In *Akin v. Dahl*, the Texas Supreme Court set forth the standard of review for the removal of a trustee. *Akin v. Dahl*, 661 S.W.2d 911, 913 (Tex.1983). Despite the discretionary language in subsection (3) of the statute, the *Akin* court instructs that our standard of review is not abuse of discretion. *See id.* (rejecting an abuse of discretion standard of review in the removal of a trustee). A trustee will be removed if the trier of fact finds that the evidence shows the trustee has committed one of the enumerated acts or an act, not enumerated, that the trial court in its discretion deems a proper ground for removal. *Id.; see also Lee v. Lee*, 47 S.W.3d 767, 791–92 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) (refusing to decline to follow the *Akin* Court's construction of the statute as mandating removal even though the plain language of the statute is discretionary in nature).

Here, the trial court found, among other things, that Barbara impeached herself on the stand and also entered other negative findings relevant here.

(21) Barbara Nava Barrientos has made no reasonably prudent decisions about the investing of [BCBS and the TCDRS proceeds]. In Court she was unable to state how she would invest these proceeds.

(22) Barbara Nava Barrientos has shown no ability to administer the [BCBS and the TCDRS proceeds] to the best interests of the children.

She has asked for the funds inappropriately and shows lack of appropriate investment knowledge.

. . .

(29) Barbara Nava Barrientos has shown such hostility that (a) Barbara Nava Barrientos' administrative plans (or lack thereof) for the [BCBS and the TCDRS proceeds] have been affected, and (b) Barbara Nava Barrientos has not been able to think and act as a fiduciary should, both of which are ultimately detrimental to the minor children she claims she is to protect.

The trial court's judgment recited, among other things, that (1) Barbara "has dealt in hostility and bad faith"; (2) Barbara was removed as " 'trustee' " and all proceeds of the BCBS policy and TCDRS annuity were to be delivered to Josie "as trustee for the minor children, Tyler and Brooke"; and (3) the proceeds were monies rightfully belonging to Josie "as trustee for the minor children, Tyler and Brooke."

Josie concedes in her response brief that subsections (1) and (2) do not apply to Barbara as reasons for removing her as trustee, although she suggests the evidence was sufficient to support removal under subsection (2) for incompetence. Therefore, we consider whether the evidence supports that the trial court "in [its] discretion" found "other cause[s]" for her removal pursuant to subsection (a)(3). *See* Tex. Prop.Code Ann. § 113.082(a)(3).

### b. Barbara was removed as trustee for "other cause"

■ The trial court's ruling that Barbara should be removed as trustee appears to be based on one or more of the following grounds, each of which would fall under the third reason for removing a trustee, "other cause": (1) Barbara had not

made reasonably prudent decisions regarding the investment of the trust funds and lacked the ability to manage them in the best interest of the children; (2) she demonstrated hostility that interfered with her ability to properly manage the trusts; and (3) she acted in bad faith and participated in a fraud on Josie. We will address only the first two, which we find sufficient to support removal for other cause. We then will turn to Barbara's claim that a portion of the judgment referring to "bad faith" is unsupported by the pleadings.

### (1) *The ability to manage the trust properly*

 The fundamental duties of a trustee include the use of the skill and prudence that an ordinary, capable, and careful person would use in the conduct of his own affairs and loyalty to the beneficiaries of the trust. *InterFirst Bank Dallas, N.A. v. Risser*, 739 S.W.2d 882, 888 (Tex.App.Texarkana 1987, no writ). Section 113.056(a) of the Texas Property Code states the following with regard to the duties and liabilities of a trustee to properly manage trust funds:

Unless the terms of the trust instrument provide otherwise, in acquiring, investing, reinvesting, exchanging, retaining, selling, supervising, and managing trust property . . . a trustee shall exercise the judgment and care under the circumstances then prevailing that persons of ordinary prudence, discretion, and intelligence exercise in the management of their own affairs . . . .

TEX. PROP.CODE ANN. § 113.056(a). There is an implied duty to invest non-income producing assets held in trust when there is a direction by the grantor to pay over the interest or income to a beneficiary, *Moore v. Sanders*, 106 S.W.2d 337, 339 (Tex.Civ.App.San Antonio 1937, no writ), and it is the trustee's duty to use reasonable diligence in so doing. *McMullen v. Sims*, 37 S.W.2d 141, 144 (Tex. Comm'n App.1931, holding approved).

In Barbara's challenge to the trial court's findings that she had not made reasonably prudent decisions regarding the trusts and failed to demonstrate an ability to manage the trust funds properly, she points to her testimony that she actively investigated investment options, she intended to pay for the expenses associated with an attorney or financial planner with her own funds and expected nothing for herself, she understood her duties as trustee, and she was a college-educated woman who had managed her husband's law firm for twelve years. However, Barbara admitted that, in the three years since she learned she was a trustee of the funds, she had not come to a decision on how to handle the funds. Her sole explanation for this was that she could not make a decision because the funds were frozen due to the dispute. Moreover, the only plan she articulated for the funds, totaling approximately $35,000, was to meet with someone from the trust division of a large Houston law firm.

Barbara's testimony regarding her efforts to investigate investment options also raised questions about her credibility and her ability to carry out the fiduciary duties she owed to the beneficiaries of the trusts. In describing the steps she had taken to obtain legal advice on the proper management of the trusts, Barbara stated she had telephoned someone at one of the firms, but did not remember the names of the persons she spoke to or the hourly rate she was told she would be charged. When asked whether, during the telephone conversation, she discussed the amount of money involved, Barbara stated only that she did not discuss the matter "at any great length." In addition to speaking to someone at a law firm, Barbara testified

she met with a CPA (whose name she did not put on the witness list) and someone at Chase Securities to "explore investment possibilities." Barbara and Josie also went to a bank together at one point to discuss investment options with a bank officer. Despite these efforts, however, she was unable to articulate any investment strategy for the funds.

Barbara also denied ever stating that she wanted to put the funds into a certificate of deposit. She testified that she did not know whether a certificate of deposit was a good investment at that time, and testified she would need to get an opinion from someone in the trust division of a law firm to make that determination. She then claimed not to remember the substance of a conversation with a BCBS representative in which, according to BCBS records, she asked to have the policy proceeds released to her so she could put them in a certificate of deposit. Nor could she remember telling BCBS representatives, as was documented in the business records, that she was setting up or finalizing a trust. There was no evidence Barbara ever took steps to prepare a trust instrument. Additionally, Barbara filed an affidavit with the court stating that she and her brother Reno had discussed the terms of the trust on his deathbed—a statement that was false and which was withdrawn in an amended affidavit.[7]

### (2) *Hostility affecting the performance of Barbara's duties as trustee*

In addition to her finding that Barbara could not effectively manage the fund, the court also found that hostility affected Barbara's ability to manage the fund. The trial court's recitation in the judgment that Barbara "dealt in hostility" does not speci-

fy whether Barbara demonstrated hostility toward the beneficiaries of the trust, her niece and nephew, or Josie. Barbara contends that there is no evidence that she was hostile to the beneficiaries of the trust and it is immaterial whether she was hostile toward Josie because she owed Josie no legal duties. And, in any event, Barbara testified that she did not feel hostility toward Josie; rather, Josie felt hostility toward her.

■ Barbara relies on *Akin v. Dahl* for the proposition that removal of a trustee requires a showing that (1) the trustee had hostility toward the beneficiaries, (2) that affects or will affect the trustee's performance in the office. *See Akin,* 661 S.W.2d at 913–14. However, we do not read *Akin* to require that the hostility affecting the trustee's performance must be directed toward the beneficiaries. In *Akin,* the Texas Supreme Court considered whether jury findings that hostility existed between the trustee and the beneficiaries justified the removal of the trustee. *Id.* at 913–14. The Court held that findings of hostility between the trustee and the beneficiaries, standing alone, was insufficient; there must be an affirmative finding that the trustee's ill will or hostility does or will affect the performance of the trustee's duties. *Id.* at 914. We find nothing in the case that suggests that hostility must be directed toward the beneficiaries of the trust. Indeed, given the Court's admonition that "[p]reservation of the trust and assurance that its purpose be served is of paramount importance in the law," we find that all circumstances affecting the trustee's ability to perform her duties may be considered. *See id.*

---

7. Barbara testified that she signed the affidavit containing the incorrect statement because she read it very quickly.

Here, Barbara testified that any hostility between them originated with Josie, while Josie testified that Barbara was hostile toward her. Josie's and Barbara's version of various events likewise differed substantially. For example, Josie testified that Barbara had initially agreed to turn over the TCDRS funds to Josie as child support. The evidence showed that Josie sent Barbara a letter in April of 1998 attaching a proposed Qualified Domestic Relations Order for her signature to complete the transaction. However, Barbara refused to sign it, claiming at trial that she had never agreed to turn over the funds, and she thought it was an improper ultimatum. Josie testified that Barbara did not speak to the children, but Barbara testified that she avoided contact with the children because she did not want her actions to be misconstrued as trying to "influence the other side."

Barbara also testified that Josie rebuffed numerous friendly overtures toward the children, but Josie's testimony contradicted Barbara's. Barbara described one incident in which she claimed that she tried to visit the children at Easter, but Josie would not let her in the apartment and made them "spend Easter in the parking lot" of the apartment complex. According to Josie, however, Barbara had telephoned her and said she had some Easter baskets for the children, but was in a hurry, so when she arrived, the children met with her in the parking lot for about fifteen minutes. Another time, Barbara testified, her mother told her that she had sent the children Christmas gifts, but Josie returned them. Josie testified that she never rejected any gifts for the children. These disparate exchanges demonstrate the existence of hostility or ill will between the two women.

Most troubling, however, was Barbara's conduct toward Josie after she learned that her brother, Reno, had failed to designate his children as the beneficiaries of the KOC policy as ordered in Reno and Josie's divorce decree. The evidence showed that shortly after Reno's death, Barbara and her mother, Margaret, met at a restaurant with a KOC representative, and Margaret filled out and signed a form to claim the proceeds. At trial, Barbara claimed she did not remember any forms being filled out while at the restaurant, but recanted after she was confronted with the signed and dated form.

Barbara learned in December 1997 that Josie believed the KOC policy proceeds belonged to the children. When Josie specifically asked about the status of the policy, Barbara did not tell her what she knew, but said only that Josie should discuss the matter with Margaret. According to Barbara, she did not know at that time whether Margaret had actually received the KOC policy proceeds (although she knew Margaret was seeking them), and her only explanation for failing to say anything to Josie was that she thought Josie should take the matter up with Margaret directly. At the Christmas party for the children, Josie showed Barbara the divorce decree containing the order that Reno designate the children as beneficiaries of the KOC policy as additional child support. Barbara also learned that Margaret had spent approximately half of the benefits. After the party, Barbara told Josie she would try to resolve the situation with Margaret. Josie testified that she talked to Barbara several times over the next week or two, but Barbara informed her she was having difficulty reaching her mother. Barbara testified that her mother never returned her phone calls, so she dropped the matter.[8] By the time Josie

8. Barbara testified that she was not involved
in her mother's business and did not know

filed her lawsuit and the funds were located, only $10,000 of the policy proceeds remained.

This testimony involved the credibility and demeanor of the witnesses. The trial court was in the best position to determine who it believed and whether the degree of hostility between Barbara and Josie did or would affect Barbara's ability to manage the trusts in the children's best interest. The trial court was clearly concerned about Barbara's willingness to permit Margaret to continue to deplete the KOC proceeds when she knew that the money was supposed to be for the children as additional child support. Among the court's findings of fact was the finding that Barbara "deliberately misled Josie" and thereby "delayed her taking action to stop the spending of the insurance until [Barbara's] mother, Margaret Nava, had spent all but $10,000.00 of the $53,004.74 she received from the [KOC policy]."

### c. Inability to manage and hostility support removal for other cause

As the sole judge of the credibility of the witnesses and the weight to be given their testimony, a trial court's findings will not be disturbed if there is evidence of probative force to support them. *See Benoit v. Wilson,* 150 Tex. 273, 281, 239 S.W.2d 792, 796–97 (Tex.1951); *Tigner v. City of Angleton,* 949 S.W.2d 887, 889 (Tex.App.-Houston [14th Dist.] 1997, no writ). While it is true that a wide measure of discretion is accorded to a trustee in the prudent operation of a trust, *see Tomlinson,* 960 S.W.2d at 339, the trial court could reasonably have concluded, in its discretion, that Barbara's inability to reach any decision regarding a proper investment strategy in anticipation of the possible release of the funds, after three years, demonstrated an inability to make prudent decisions or manage the funds in the best interest of the children. *See Moore,* 106 S.W.2d at 339 (holding lack of business experience may be considered on question of removal of trustee); *see also Burnett v. Smith,* 240 S.W. 1007, 1010 (Tex.Civ.App.-Fort Worth 1922, no writ) (stating that a court of equity has the power to remove a trustee upon a proper showing of unfitness).

The court also could have concluded that hostility existed between the two women as evidenced in two ways: first, by Barbara's failure to reveal to Josie what she knew about the KOC policy and second, by the fact that Barbara's and Josie's testimony was so completely contradictory in many areas. Barbara and Josie gave so much contradictory testimony that an appellate court would never be able to resolve it; we find it hard to conceive of the case in which we could ignore the trial court's own credibility decisions with so much contradictory testimony. Having found this hostility to exist, the court could have concluded that it would impair Barbara's ability to disburse the funds in a manner consistent with the children's best interests. *See* Tex. Prop.Code Ann. § 113.082(a)(3); *Akin,* 661 S.W.2d at 913–14; *Moore v. Sanders,* 106 S.W.2d at 339 (finding evidence of lack of business experience, antagonism towards mother of beneficiaries, and other grounds, taken together, sufficient to remove trustee).

In short, we find that the evidence is sufficient to support the trial court's removal of Barbara as trustee under subsection 113.082(a)(3) for "other cause," and we conclude that the trial court did not err in

---

how she spent the money. However, she also admitted she talked to Margaret several times a month.

removing Barbara as trustee for "other cause."

### d. The reference in the judgment that Barbara acted in bad faith must be removed

■ Barbara also contends that the trial court's findings of fact and conclusions of law relating to bad faith and Barbara's participation in a fraud on Josie are not supported by the pleadings or the evidence.[9] She also contends that the allegation of bad faith in the judgment is not supported by Josie's pleadings. In response, Josie challenges Barbara's characterization of the evidence, but does not challenge Barbara's assertion that the recitation of "bad faith" in the judgment is not supported by Josie's pleadings.

The judgment recites the following: "There is evidence before the Court that Barbara Nava Barrientos has dealt in hostility and bad faith." Although Josie's petition and the evidence support the conclusion that Barbara "dealt in hostility" toward Josie, Barbara is correct that Josie's petition does not allege that Barbara acted with bad faith or violated a fiduciary duty. Therefore, we order the sentence's reference to "bad faith" stricken from the judgment as unsupported by the pleadings, and we strike the remainder of the sentence as unnecessary to the judgment. *See* Tex.R. Civ. P. 301 (judgment shall conform to the pleadings and proof). Thus, this entire sentence shall be stricken from the judgment.

### 3. Substituting Josie as Trustee

■ We now turn to Barbara's claim that the trial court erred in substituting Josie Moreno as trustee. Barbara claims Josie was not diligent in protecting the

KOC policy and obtaining the proceeds for the children. She also complains that the evidence is insufficient to support the trial court's finding of fact that Josie was "business-like, has knowledge of appropriate investments and has demonstrated her capabilities," and had "made direct and prudent requests of Barbara Nava Barrientos." Additionally, citing *Brault v. Bigham,* 493 S.W.2d 576, 579 (Tex.Civ.App.-Waco 1973, writ ref'd n.r.e.), Barbara contends that Josie should be disqualified from serving as trustee because she sought the TCDRS annuity for her own use. We disagree.

### a. The evidence supports Josie's substitution

■ A court may remove or appoint a trustee when it becomes necessary for the protection and preservation of the trust. *Brault v. Bigham,* 493 S.W.2d at 579; *Republic Nat. Bank & Trust Co. v. Bruce,* 130 Tex. 136, 139, 105 S.W.2d 882, 884 (1937) ("The safety of the trust fund is the first care of the law, and on this depends every rule which has been made for the conduct of trustees."). Having determined that the evidence demonstrated that Barbara must be removed as trustee, the trial court was obliged to find someone to replace her as trustee. The trial court determined that Josie, the children's mother, was an appropriate replacement. We agree.

As the children's mother, Josie was in the best position to ascertain the children's needs and was therefore a logical choice. Josie was the party deprived of the additional child support the KOC policy was to provide, and substituting her as trustee gave her control over the trust funds for the benefit of the children. Notably, Bar-

---

9. Because we have already determined that the first two reasons discussed are sufficient to support Barbara's removal, we will not address the sufficiency of the evidence supporting these challenged findings and conclusions.

bara does not suggest an alternative, and certainly neither Margaret nor Barbara's sister, Janet, would be appropriate substitutes under the circumstances.

Moreover, contrary to Barbara's claim, we find sufficient evidence to support the trial court's findings that Josie demonstrated an ability to invest the monies on behalf of the children and had made "direct and prudent" requests of Barbara. When asked about how she thought the funds should be invested, Josie testified that she was "very conservative" and did not invest in stocks. Josie testified that she thought the Texas Tomorrow Fund was a good way to provide for the children's college education, and she had submitted applications for the children; but, when she was unable to turn over the funds, her application was canceled. It was undisputed that Josie spoke with Barbara regularly regarding Barbara's handling of the BCBS policy and the TCDRS annuity, and that the two of them met with a bank officer at one point to discuss investment options. It was also undisputed that Josie had her attorney draft documentation for Barbara's signature to permit the TCDRS annuity funds to be used as child support (the parties disagree about whether Barbara initially consented to the arrangement), which Barbara later refused to sign. Despite Barbara's characterization of Josie's request as an improper ultimatum, it does not appear unreasonable or imprudent, given the loss of the additional child support the KOC policy was to provide.

Barbara contends, however, that Josie is not a suitable trustee because she was not diligent in protecting the KOC proceeds for the children. Specifically, Barbara criticizes Josie for (1) failing to demand written confirmation that Reno had designated the children the beneficiaries of the KOC policy after the divorce, and (2) failing to contact KOC directly after Reno died, and instead relying on Barbara. While Josie may not have acted as aggressively as Barbara claims she should have, the record shows Josie made efforts to confirm that Reno had complied with the divorce decree, and she relied on Barbara because Barbara was the trustee of the BCBS policy and the TCDRS annuity and spoke to her regularly about them. While Josie may have been mistaken to assume that Barbara was handling the KOC policy as well, Barbara's actions after Josie specifically asked about the policy hindered Josie's efforts to obtain the money for her children. When Josie specifically asked Barbara about the status of the KOC policy, Barbara did not tell Josie that she knew Margaret was claiming the funds as the named beneficiary, but said only that Josie should speak to Margaret about it. When Josie learned the KOC policy benefits had been paid to Margaret and half of the money was already spent, Josie also relied on Barbara to try to resolve the matter with Margaret. Barbara, however, admittedly "dropped the matter" when Margaret did not return her calls. By the time Josie filed suit and the money was located, only $10,000 remained.[10]

Barbara also argues that Josie should be disqualified as trustee because she "demanded" that Barbara sign the documentation directing that the TCDRS annuity be paid to her as "support" and later sued to obtain the money for use toward "basic living expenses." However, the evidence shows that Josie was attempting to remove

10. Barbara also complains that Josie was not diligent because she did not file suit until three months after Barbara told her she was having no success in her efforts to speak to Margaret. At the same time, however, Barbara complains that she was never able to invest the trust funds because Josie sued her before she could do so.

Barbara as trustee of the TCDRS annuity so that the money could be used for child support, not her individual use. Moreover, Josie sought the money to substitute for the lost KOC policy proceeds, which had been designated as additional child support.

Given the totality of the circumstances, we do not find it arbitrary or unreasonable that the trial court substituted Josie as trustee.

**b. The case law supports this decision**

The case of *Moore v. Sanders* supports this conclusion. In *Moore*, the mother of two children brought suit to replace the trustee of a fund left to the children by the father, who was deceased. *Moore*, 106 S.W.2d at 338. The court of appeals upheld the appointment of the mother as trustee because she sought "nothing for herself," but wanted only to charge the fund with unexpected medical expenses incurred by the children and a monthly allowance for the education and maintenance of the children. *Id.* at 338–39. The court reasoned that the mother's intent was not to divest her minor children of any of the trust fund, but rather, to recover it for them. *Id.* at 339.

We find the facts of *Moore* indistinguishable from the case at hand. Here, the trial court, as the sole judge of the credibility of the witnesses and the weight to be given their testimony, decided that it was in the best interest of the children to remove Barbara as trustee and place Josie in her stead. In so doing, the trial court did not divest the beneficiaries of title to the trusts, but rather, protected the trusts from mismanagement. *See id.*

We also find Barbara's reliance on *Brault* misplaced. In *Brault*, a husband and wife were killed in an airplane crash, leaving four minor children. *Brault*, 493 S.W.2d at 577. The husband's mother was

designated as a secondary beneficiary (after the wife) of the husband's life insurance policy. *Id.* The wife's sister became guardian of the minor children, and in that capacity, she sued the insurance company and the mother for the proceeds, claiming that the mother was named as a beneficiary only as a trustee for the children. *Id.* In response, the mother sought to recover the proceeds individually, but she later abandoned that claim and sought to recover the funds as "custodian" for the children but "free from the control of any guardian, administratrix, probate court or other outside agency." *Id.* at 577–78. On appeal, the court stated that a trustee's intention or attempt to appropriate trust funds for her own use constituted a breach of trust, and held that the trial court did not abuse its discretion in removing mother as trustee. *Id.* at 579. We find the circumstances here materially different than the situation in *Brault*.

Accordingly, we conclude that the trial court did not err in appointing Josie as trustee of the BCBS and the TCDRS proceeds; Barbara's complaint on this matter is overruled.

**C. TRIAL COURT BIAS**

▬▬ Lastly, Barbara contends that the trial court was swayed by improper bias against her. For this proposition, she cites *Metzger v. Sebek*, 892 S.W.2d 20, 37–39 (Tex.App.-Houston [1st Dist.] 1994, writ denied). *Metzger* holds that to reverse a judgment for improper conduct or comments of the judge, an appellate court must find that judicial impropriety was in fact committed and the complaining party was probably prejudiced. *Id.* at 39. The scope of our review is the entire record. *Id.* We note that " 'judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do

not support a bias or partiality challenge.'" *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 240 (Tex.2001) (citing *Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994)). Such remarks may constitute bias if they reveal an opinion deriving from an extrajudicial source; however, when no extrajudicial source is alleged, such remarks will constitute bias only if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. *See Ludlow v. DeBerry*, 959 S.W.2d 265, 271 (Tex. App.-Houston [14th Dist.] 1997, no writ) (citing *Liteky*, 510 U.S. at 554–56, 114 S.Ct. 1147).

We have examined the entire record and conclude that Barbara has failed to demonstrate judicial impropriety that resulted in harmful error. And, as in *Metzger*, we decline to unnecessarily lengthen this opinion with a review of each exchange Barbara identifies in her brief, because no useful purpose would be served by do so. *See Metzger*, 892 S.W.2d at 39. Clearly, this judge had strong opinions about Barbara. However, these opinions were based on the testimony and evidence the judge heard and saw during the trial. This is not grounds for improper bias. We overrule this complaint.

### CONCLUSION

In sum, we hold that the trial court had jurisdiction to hear the support matters initially brought before it and that, having already acquired jurisdiction over some of the parties and property in dispute, it had jurisdiction in its capacity as a district court to hear and adjudicate the party and property later added. We hold, contrary to the trial court, that Reno Nava intended

---

11. We did not discuss Barbara's third broad issue alleging that the court improperly imposed a constructive trust on the TCDRS and BCBS funds. However, this issue and its sub

---

the TCDRS and BCBS accounts to be held in trust for his two children, with Barbara as trustee. We also hold that the evidence supports the court's decision to remove Barbara as trustee and to name Josie trustee for the accounts for the benefit of her children.[11] Finally, we strike the reference in a sentence of the judgment to "bad faith" as unsupported by the pleadings, and we strike the remainder of the sentence as unnecessary to the judgment. The judgment of the trial court is affirmed as modified.

parts are moot in light of our conclusion that Reno Nava placed these accounts in trust for his children.