Affirmed as Modified and
Memorandum Opinion filed December 8, 2005.

 

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-04-00912-CV

____________

 

WILLIAM ALFORD, Appellant

 

V.

 

SIMONE MARINO,
ADMINISTRATRIX OF THE ESTATE OF MATHEW ALFORD, DECEASED, Appellee

 



 

On Appeal from the 333rd
District Court

Harris County, Texas

Trial Court Cause No. 02-06251

 



 

M E M O R A N D U M   O P I N I O N

Simone Marino, daughter and administratrix
of her father=s estate, sued her uncle, William Alford,
for depleting her father=s estate while William was her father=s guardian. The
parties tried the case to the court, which entered a judgment for Ms. Marino as
administratrix.  William Alford now
complains the evidence is legally and factually insufficient to support the
trial court=s judgment awarding damages and attorney=s fees to Ms.
Marino.  For the reasons stated below, we
affirm the judgment as modified.

Factual Background

William Alford is one of eleven children
born to C.D. and Willie Mae Alford, and the brother of Mathew Alford, the
deceased ward.  Appellee Simone Marino is
one of Mathew=s three children.  

Mathew worked as a pipe fitter at Champion
Paper Company for approximately twenty years before he sustained a chemical
burn which forced him to retire in 1985 or 1986.  He then began receiving $310 per month in
disability benefits.  At the time, Mathew
lived alone in his home at 4201 Leffingwell Street in Houston.  

Mathew=s physical health
and cognitive abilities began to deteriorate, and in 1988, he moved in with
William and his wife, Lee, in Houston. 
The next year, William was appointed guardian of Mathew=s person and
estate.  The court required an $8,000
bond, which William posted through Fidelity & Deposit Company.  

Mathew began receiving social security
benefits of approximately $1,059 per month, and he also received a lump sum
payment of $10,000 for past benefits. 
William deposited the lump sum payment into a certificate of deposit
(CD) account at Capital Bank in Houston. 
In the latter part of 1989, Mathew moved to Louisiana to live with his
mother, Willie Mae Alford.  Because of
Mathew=s change of
residence, in March of 1992, the Social Security Administration sent a letter
to his mother informing her that she had been designated the Arepresentative
payee@ of Mathew=s social security
checks, and further informing her that each year she would be asked to account
to the Social Security Administration for how she used the money.  In January of 1997, the Social Security
Administration sent a similar letter to William, informing him that he was now
the representative payee of Mathew=s checks and
informing him of his duty to account for his use of the money.  It also reflected an increase in the amount
of the check to $1,215 per month.

Although the date is unclear, some time in
1996, Mathew returned to Houston by ambulance. 
In February of 1997, Mathew was placed in a nursing home.  Approximately one month later, on March 7,
1997, Mathew died.  








Procedural Background

Shortly before Mathew=s death, Mathew=s son filed a
complaint in probate court to require William to file an annual and final
accounting.  At the same time, Simone
filed an application to be appointed as her father=s guardian.  In August of 1998, the probate court removed
William as Mathew=s guardian and appointed Tim Weaver
successor guardian of Mathew=s estate.  Weaver filed an inventory and list of claims
identifying $8,201.50 in Mathew=s estate, and the
probate court approved it without objection. 
Eventually, the probate court approved the final settlement, discharged
Weaver as successor guardian, and closed the guardianship.

In February of 2002, Simone, as
administratrix of Mathew=s estate, filed this action in district
court, alleging, among other things, that William breached his fiduciary duty
as Mathew=s guardian and failed to account for
Mathew=s funds.  She also sued Fidelity on the bond and sought
attorney=s fees under
section 38.001 of the Texas Civil Practice and Remedies Code based on the bond.

In October of 2003, the case was tried to
the bench.  On June 30, 2004, the court
entered a judgment awarding Simone damages of $105,922.01, and additional
damages of $7,415.82 as a penalty under section 758 of the Probate Code for
William=s failure to
timely turn over the money in Mathew=s estate to Tim
Weaver, the successor guardian.  The
court also entered judgment against William and Fidelity, jointly and
severally, for $8,000, representing the amount of the bond.  The court further awarded Simone attorney=s fees of $12,200
through trial, $2,500 if there is an unsuccessful appeal by and of the
defendants, $1,500 if a petition for review is filed at the Texas Supreme
Court, and $2,500 if the petition is granted and there is an appeal to the
Texas Supreme Court.  Findings of fact
and conclusions of law were requested and filed.  This appeal followed.

Issues on Appeal








William Alford raises two issues: (1) the
evidence is legally and factually insufficient to support the trial court=s findings of fact
and conclusions of law and the judgment; and (2) the evidence is legally and
factually insufficient to support the award of attorney=s fees to Simone
Marino.  We address each in turn.

I.        Standards
of Review

Findings of fact in a bench trial have the
same force and dignity as a jury=s verdict upon
jury questions.  City of Clute v. City
of Lake Jackson, 559 S.W.2d 391, 395 (Tex. Civ. App.CHouston [14th
Dist.] 1977, writ ref=d n.r.e.). 
When challenged on appeal, the findings are not conclusive if there is a
complete reporter=s record, as there is here.  In re K.R.P., 80 S.W.3d 669, 673 (Tex.
App.CHouston [1st
Dist.] 2002, pet. denied).  The trial
court is the sole judge of the credibility of the witnesses and the weight to
be given their testimony. Barrientos v. Nava, 94 S.W.3d 270, 288 (Tex.
App.CHouston [14th
Dist.] 2002, no pet.).  The trial court=s findings will
not be disturbed if there is evidence of probative force to support them.  Id. 
A trial court=s findings are reviewable for legal and
factual sufficiency of the evidence by the same standards that are applied in
reviewing evidence supporting a jury=s answer. Catalina
v. Blasdel, 881 S.W.2d 295, 297 (Tex. 1994). 

We review the trial court=s conclusions of
law de novo.  Smith v. Smith, 22
S.W.3d 140, 143B44 (Tex. App.CHouston [14th
Dist.] 2000, no pet.).  Under a de novo
review, we exercise our own judgment and redetermine each legal issue.  Quick v. City of Austin, 7 S.W.3d 109,
116 (Tex. 1998).  We will uphold
conclusions of law on appeal if the judgment can be sustained on any legal
theory the evidence supports. 
Waggoner v. Morrow, 932 S.W.2d 627, 631 (Tex. App.CHouston [14th
Dist.] 1996, no writ).  Incorrect
conclusions of law do not require reversal if the controlling findings of fact
support the judgment under a correct legal theory.  Id.

II.       The
Evidence is Not Legally and Factually Sufficient to Support the Trial Court=s Findings of Fact
and Conclusions of Law and Judgment








In his first issue concerning the legal
and factual sufficiency of the evidence, William raises three sub-issues: (1)
whether the evidence supports the findings that he failed to comply with the
Probate Code because he did not account for Mathew=s social security
benefits; (2) whether the evidence supports the damages award; and (3) whether
the trial court improperly shifted the burden of proof to William as
guardian.  We will first address
sub-issue 3 concerning the burden of proof. 
We will then address sub-issues 1 and 2 together, because they both go
to William=s contention that the evidence does not
support the damages award of $105,922.01.[1]  Although we conclude that the trial court did
not err in shifting the burden of proof to William to account for his use of
William=s money, we agree
with William that he was not required to account for Mathew=s social security
benefits during the time Mathew=s mother was
designated the representative payee of the benefits; as we discuss below, no
evidence showed that William received benefits during that period. 

A.      The
Trial Court Did Not Err in Shifting the Burden of Proof to William to Account
for Mathew=s Money.

1.       The
burden-shifting process








As Mathew=s guardian,
William owed fiduciary duties to Mathew. 
However, William contends that the trial court erroneously shifted the
burden to him to prove he properly and fairly used Mathew=s money.  He alleges that a presumption of unfairness
does not arise until after it has been shown that the fiduciary profited from
the transaction, and no evidence shows that he did so.  At most, William urges, the evidence shows he
was a poor bookkeeper, not that he misappropriated Mathew=s income.  In connection with this argument, William
challenges the trial court=s following
findings of fact (as summarized): William Alford was in a fiduciary position and so bore the
burden to explain all expenditures and income received by Mathew; he could not
account for Mathew=s income and expenses and so did not sustain his burden;
William was liable to Mathew=s estate for $105,922.01; and William failed to comply with
the requirements of Probate Code sections 668 and 741.  William also challenges the corresponding
conclusions of law:  William breached
fiduciary duties to Mathew; the burden shifted to him to prove the fairness of
the transactions; he did not sustain this burden; he failed to fulfill his
obligations under the law; and he was liable to Mathew=s estate for
$105,922.01.  We find, however, that
under the facts of this case the trial court properly placed the burden on
William to account for Mathew=s money.

As Mathew=s guardian,
William owed fiduciary duties to Mathew. 
When a fiduciary benefits from transactions with the principal, the
burden shifts to the fiduciary to show the transactions are fair and
reasonable.  See, e.g., Tex.
Bank & Trust Co. v. Moore, 595 S.W.2d 502, 508B09 (Tex. 1980); Stephens
County Museum, Inc. v. Swenson, 517 S.W.2d 257, 261 (Tex. 1974).  Even in the case of a gift between parties
with a fiduciary relationship, A>equity indulges
the presumption of unfairness and invalidity, and requires proof at the hand of
the party claiming validity . . . of the transaction that it is fair and
reasonable.=@ Estate of
Townes v. Townes, 867 S.W.2d 414, 417 (Tex. App.CHouston [14th
Dist.] 1993, writ denied) (quoting Sorrell v. Elsey, 748 S.W.2d 584, 585
(Tex. App.CSan Antonio 1988, writ denied)).  We hold that the facts recited belowCwhich show that
William could not explain how much of Mathew=s money he spent
or where he spent most of itCsufficiently
undermined William=s claim of fairness that the trial court
rightly shifted the burden to William to affirmatively prove his actions were
beneficial to Mathew.

At trial, William acknowledged that, while
he was Mathew=s guardian, Mathew received $310 per month
in disability benefits, at least $1000 per month in social security benefits,
and interest on the CD and his other accounts. 
William also acknowledged that he did not file annual accountings as
required under Probate Code section 741. 
See Tex. Prob. Code
' 741.  In fact, during his eight-plus years as
Mathew=s guardian,
William filed only one accounting with the probate court: the final accounting
in May of 1997, which he filed only after Mathew=s son filed a
complaint to require him to do so. 








This final accounting, which Simone placed
in evidence, showed that in 1997, Mathew had a savings account containing
$6,678.61 and a checking account containing $1,453.71.  It also showed rental income of $800 for Mathew=s house on
Leffingwell, which was apparently all that was earned during the entire period
William was guardian.  For each year of
the guardianship, William had provided a handwritten statement reflecting the
balance in each of Mathew=s bank accounts, minus an amount
reflecting money withdrawn that year. 
William provided very few bank statements, and he did not identify any
of Mathew=s monthly income.  The withdrawals were supported by a few
copies of checks or receipts.  Checks
were sometimes made out to cash, and some were made out to merchants or others
with little or no description of the reason for the payment.[2]  Numerous receipts were included reflecting
monthly payments of $200 to Lee Alford (William=s wife) for Acaretaking,@ even during the
time Mathew lived in Louisiana, and a rental car for Lee Alford was paid for
with Mathew=s money. 
Many checks were out of sequence or missing.[3]  There were withdrawals for money spent on Mathew=s truck, although
he was not driving it, and repairs to his house, although he was not living in
it.  William also paid for improvements
to his mother=s home in Louisiana, including septic tank
repairs, new wiring, and roofing.  Some
of the expenses were counted more than once or there were mathematical errors
in the total amount of withdrawals.  Additionally,
although interest income reported in the first month of the guardianship was
$464.69, William reported income interest of much less in the following
years.  

2.       William=s lack of records
and Mathew=s loss of money








William could not explain why he had not
accounted for any of Mathew=s income, nor
could he explain why the interest income was so much less after the first year
of his guardianship.  Regarding the
missing and out-of-sequence checks, he claimed he voided many checks, and
sometimes wrote checks from different books. 
He also testified that he had no idea where many of the checks went, but
insisted that the money was spent Afor Mathew.@  William testified he would send $500B600 per month to
his mother in Louisiana for Mathew=s care, but he
often sent cash, and did not get receipts. 
He also acknowledged that his wife, Lee, was paid for Acaretaking@ even when Mathew
was living in Louisiana, and explained that the rental car was so that she
could take Mathew to and from doctor=s appointments at
the VA hospital in Houston.  Concerning
repairs to Mathew=s house, William explained at one point
that he made repairs so the house would comply with city requirements, and
later he testified he had fixed it up while his sister lived in it for a couple
of months, and she paid rent during that time. 
When questioned about what happened to the CD, which was not listed in
the final accounting, William stated that he did not know what happened to it.[4]

3.       What
the trial court could properly have concluded

On these facts, we find that Simone
presented sufficient evidence that William withdrew money from Mathew=s accounts over
the years and could not account for the majority of it.  Thus, the trial court could have determined
that William benefitted personally from that money, and so correctly placed the
burden on William to rebut the presumption of unfairness of the
transactions.  See Townes, 867
S.W.2d at 417B18 (holding that when parties stipulated
son owned fiduciary duties to mother and son withdrew funds from mother=s account, burden
was on son=s estate to rebut presumption transactions
were unfair).  








Based on William=s testimony and
the other evidence, the trial court found that Mathew received an annual income
of $17,320 per year, representing the total of his monthly disability payments,
his monthly social security benefits, and the interest on his CD.[5]  This annual income was reduced by William=s checks and
receipts for expenses, and after an adjustment for mathematical inaccuracies in
William=s accounting, the
total amount unaccounted for was $105,922.01. 
Even though the trial court allowed William credit for  all of the disbursements he supported with
checks or receipts, this at most shows that William successfully rebutted the
presumption of unfairness as to those amounts onlyCit does not
demonstrate, as William suggests, that the trial court found no self-dealing or
misappropriation of the rest of Mathew=s money.[6]


Having determined that the trial court did
not err in shifting the burden to William to account for his expenditures of
Mathew=s money, we next
consider William=s contention that he should not have been
required to account for Mathew=s social security
benefits during the time his mother was the designated representative payee for
the benefits.   

B.      The
Evidence is Not Legally and Factually Sufficient to Support All of the Damages
Awarded Against William.

1.       The
alleged fallacy with the court=s findings of fact
and conclusions of law








The trial court concluded that William
failed to fulfill his statutory duty under section 741 of the Probate Code to
annually account for Mathew=s money, and that
William could not account for $105,922.01 of it.  See Tex.
Prob. Code ' 741. 
In reaching these conclusions, the trial court found, among other
things, that William failed to adequately account for Mathew=s monthly social
security benefits.  These benefits
constitute the largest component of the damages award.  On appeal, William contends he was not
required to account for Mathew=s social security
benefits during the time the Social Security Administration had designated
Mathew=s mother, Willie
Mae Alford, the representative payee of the benefits, and there is no evidence
that William received those benefits instead of Mrs. Alford.  On this basis, William challenges the legal
sufficiency of the evidence supporting the trial court=s judgment, its
findings of fact 26, 28B31, and 38, and its conclusions of law 9B11 and 13B15. We agree with
William=s contentions, and
hold that he should not have been required to account for social security
payments made to Mathew=s mother.

2.       The
evidence presented at trial

William offered evidence that the Social
Security Administration designated Mathew=s mother, Willie
Mae Alford, as Mathew=s Arepresentative
payee@ in a March 25,
1992 letter addressed to her.  It recited
in relevant part the following:

We have chosen you to be MATHEW
ALFORD=S representative payee.  The rest of this letter will give you
information about the checks you will receive while you are the payee.

What We Will Pay And When

You will receive $1059. for March
1992 around April 3, 1992.

After that you will receive
$1059.00 each month.

It Is Important To Keep Track Of
This Money

You will need to
keep track of how you use all of the money we send you for MR. ALFORD.  Each year we will ask you to report on how
you used the money.  We call this a
representative payee accounting.

Mrs. Alford
remained the representative payee through December 1996.  In January of 1997, the Social Security
Administration sent another letter in the same form advising William that he
would be Mathew=s representative payee and that he
would receive payments of $1,215.00 per month, beginning with the payment for
January.  Thus, for fifty-eight months
(from March 1992 through December 1996), Ms. Alford received Mathew=s social security benefits as
representative payee.  Using the rounded
figure applied to determine damages, the total amount of these benefits is as
follows:

$ 
1,100

   
x   58

$63,800

Thus, William contends the trial court erred in
including this amount in the damages award.








3.       Case
law establishes that payments sent to someone other than the guardian are not
part of the guardianship

Case law has established that these social
security payments were not part of the guardianship.  In Tharp v. Blackwell, the court
determined that social security benefits paid to individual payees other than
the guardian are not included in the ward=s estate;
therefore, the guardian is not required to account for them.  See 570 S.W.2d 154, 160B61 (Tex. Civ. App.CTexarkana 1978, no
writ), superseded by statute on other grounds, Waguespack v. Halipoto,
633 S.W.2d 628 (Tex. App.CHouston [14th Dist.] 1982, writ dism=d w.o.j.).  However, if the funds are paid to the
guardianship or are commingled with guardianship estate funds, then they must
be accounted for by the guardian.  Id.
at 161.  This holding is consistent with
language in the State Bar=s Guardianship Manual, which provides as
follows:

The power of a
court-appointed guardian of the estate to receive and manage [social security]
benefits is subordinate to that of a representative payee.  The Social Security Administration may deny a
court-appointed guardian of the state the right to receive the ward=s [benefits] and
may appoint another individual as representative payee.  

State Bar of Tex., Texas Guardianship Manual, ' 3.3 (2d ed.
2003). 

No evidence in this case shows that
William was still receiving Mathew=s social security
benefits while Mrs. Alford was the designated recipient in the Social Security
Administration=s records. 
Although we do not want to reward bad record-keeping, there simply is
nothing more than mere suppositions that William continued receiving the social
security benefits while Mrs. Alford was the designated recipient by the Social
Security Administration.  Even the trial
court remarked that the Social Security Administration letter designating Mrs.
Alford as recipient beginning April 1992 was uncontroverted.  In addition, William testified that he was
not receiving these funds.








Although Simone argues that it is apparent
A[f]rom William
Alford=s testimony and
the exhibits he offered in his Final Accounting that [Mrs.] Alford did not
receive the Social Security checks,@ the part of the
record she relies on for this involves the year 1990, two years before the
Social Security Administration letter to Mrs. Alford.  In addition, because of William=s abysmal records,
very little in this record is apparent. 
Applying the standards of review for legal and factual sufficiency
challenges by a party with the burden of proof on an issue, see Dow Chem.
Co. v Francis, 46 S.W.3d 237, 241 (Tex. 2001), we find that William
conclusively showed that his mother received Mathew=s social security
benefits from January 1992 thorough December 1996, and the trial court=s findings to the
contrary are so against the great weight and preponderance of the evidence that
they are clearly wrong and unjust. 
Therefore, we hold the trial court erred by finding that William failed
to account for those benefits and the amount of the benefits should not have
been included as damages against William. 

We therefore sustain this issue, reverse
that portion of the judgment awarding $105,922.01 against William and reform
the judgment to award $42,122.01.

III.      The
Evidence is Legally and Factually Sufficient to Support the Award of Attorney=s Fees

In his second issue, William contends the
evidence is legally and factually insufficient to support the award of attorney=s fees.  William also challenges the trial court=s findings of fact
numbers 32, 33, and 37, and conclusions of law 12 and 19.  These findings and conclusions reflect that
the trial court awarded attorney=s fees to Simone
under section 668 of the Probate Code because she filed suit to obtain
compliance with the statutory duty to account. 

William replies with several arguments in
support of his contention.  First, he
argues that Simone did not plead for a recovery of attorney=s fees under section
668 of the Probate Code.  Second, he
contends section 668 does not apply to Simone=s claims against
him.  Third, and last, he contends the
evidence is legally and factually insufficient to support any finding that the
fees were reasonable and necessary.  We
address each in turn.

 

 








A.      William
Waived Any Claim of Pleading Defect.

William first contends Simone did not
plead for an award of attorney=s fees under the
Probate Code, and therefore waived any claim for fees.[7]  Simone responds with two arguments:  (1) her pleading supports an award of
attorney=s fees under
section 668 of the Probate Code because she pleaded, and the trial court found,
that William violated his statutory duty to account for Mathew=s money, and (2)
in any event, the issue was tried by consent. 
William denies that the issue was tried by consent, claiming that he
objected to Simone=s request for fees in a post-trial brief
in opposition to the request, and filed proposed findings of fact and
conclusions of law denying any fee recovery to Simone.  

However, we have reviewed William=s post-trial
filings, and nowhere within them does he object to an award of attorney=s fees on the
basis of a pleading defect.  Therefore,
William has waived the right to object to a failure to specifically plead for
attorney=s fees under
Probate Code section 668.  See Tex. R. Civ. P. 90 (providing that
pleading defects not specifically pointed out by exception in writing and
brought to the trial court=s attention before
the judgment is signed are deemed waived).

Moreover, even if Simone did not expressly
plead for attorney=s fees under section 668, she may be
entitled to them if she pleaded facts which, if true, entitle her to the relief
sought.  See Mitchell v. LaFlamme,
60 S.W.3d 123, 130 (Tex. App.CHouston [14th
Dist.] 2000, no pet.) (petition authorized recovery of attorney=s fees even though
party failed to plead for attorney=s fees under the
proper statute given petition included a general prayer for attorney=s fees and a
recitation of facts entitling him to the relief sought).  Accordingly, we turn to William=s next contention,
that section 668 does not apply to Simone=s claims.

 








B.      Section
668 Applies to Simone=s Claims.

The trial court specifically found that
Simone, as administratrix of Mathew=s estate, filed
this suit Ato obtain compliance@ with the
statutory duties William, as guardian, neglected, and she was therefore
entitled to recover reasonable and necessary attorney=s fees under
Probate Code section 668.  Section 668
provides as follows:

When costs are incurred because a
guardian neglects to perform a required duty or if a guardian is removed for
cause, the guardian and the sureties on the guardian's bond are liable for:

(1) costs of removal and other
additional costs incurred that are not authorized expenditures under this
chapter; and

(2) reasonable attorney=s fees incurred in
removing the guardian or in obtaining compliance regarding any statutory duty
the guardian has neglected.

Tex. Prob. Code ' 668.  Among other things, the trial court found
that William failed to comply with Probate Code section 741, because he failed
to file annual accountings, and the final account he did file failed to comply
with that section=s requirements.  See Tex.
Prob. Code ' 741(a)(3), (c)(1)B(c)(2).  

William contends section 668 does not
apply to Simone=s suit because it was not a suit Ato remove a
guardian or to force compliance with a statutory duty.@  William points out he had already been
removed as guardian and the guardianship proceeding had been closed.  Further, he characterizes Simone=s claim as Aat best@ one for breach of
fiduciary duty, which ordinarily does not support an attorney=s fee award.  See Potter v. GMP, L.L.C., 141 S.W.3d
698, 705 (Tex. App.CSan Antonio 2004, pet. dism=d) (recognizing
that attorney=s fees 
are generally not recoverable for breach of fiduciary duty claims).  However, we do not read either Simone=s petition or the
statute so narrowly.








In her petition, Simone alleged that
William was the guardian of Mathew=s estate, and it
was necessary to file suit against him as a result of his Afraud and
misappropriation@ of Mathew=s funds.  She alleged that William failed and refused
to file accountings of the funds Mathew received and how they were spent, and
she also alleged that, as a result of William=s failure to
perform his fiduciary duties, the probate court removed him as guardian.  Simone further alleged that William
wrongfully spent funds belonging to Mathew, and that she was therefore suing,
as administratrix of the estate of Mathew Alford, both William and the bonding
company for the dissipation of funds that rightfully belonged to Mathew=s estate.

We find that Simone=s petition
sufficiently set forth allegations to entitle her to an award of attorney=s fees under
section 668, and we hold that the trial court=s findings support
such an award.  Section 668 provides that
guardians and their sureties are liable for reasonable attorney=s fees incurred in
two situations:  (1) removing the
guardian; or (2) in obtaining compliance regarding any statutory duty the
guardian has neglected.  See Tex. Prob. Code ' 668(2).  Simone sought to force compliance with the
statutory duties William neglected; clearly those claims fall under subsection
(2) of section 668.  Moreover, we are to
liberally construe the Revised Statutes to achieve their purposes and promote
justice.  See Maley v. 7111 Southwest
Freeway, Inc., 843 S.W.2d 229, 231 (Tex. App.CHouston [14th
Dist.] 1992, writ denied); Tex. Gov=t Code ' 312.006.  William=s narrow reading
of the statute would prevent a beneficiary or an estate from recovering its
costs and attorney=s fees against a neglectful guardian
merely because the guardian has already been removed.  Such an interpretation is inconsistent with
the statute=s general purpose of requiring the
neglectful guardian and his surety, not the estate, to bear any losses the
guardian generated by his neglect of statutory duties.  Therefore, we hold that the trial court did
not err in awarding attorney=s fees to Simone
under Probate Code section 668.

C.      The
Evidence is Legally and Factually Sufficient to Support the Attorney=s Fees Awarded.








Finally, William contends that the
evidence is legally and factually insufficient to support any finding that the
fees were reasonable and necessary.  In
support of his contention, William cites the general factors to be considered
under Arthur Andersen & Co. v. Perry Equipment Corp., 945 S.W.2d
812, 817B19 (Tex. 1997),
and argues that Simone=s counsel did not provide a breakdown of
the fees or details concerning the amount of time expended on specific tasks
and whether all the tasks had to be performed by a licensed lawyer.  We disagree.

At trial, one of Simone=s attorneys,
William McLeod, testified concerning the attorney=s fees incurred by
the lead counsel for Simone, Harry Arthur. 
McLeod testified to (1) the reasonable rate for an attorney of Arthur=s experience, (2)
when the representation began, and (3) the specific actions taken on Simone=s behalf.  Based on Arthur=s rate and the
activities Arthur undertook, McLeod testified that Arthur=s total time through
mediation was 45 hours at $200 per hour for a total of $9,000.  He further testified that Arthur had spent
twelve hours in trial and four hours post-trial, which came to $3,200 for
sixteen hours of work, making the total attorney=s fees incurred
$12,200.  McLeod also testified that an
appeal to the court of appeals would be an additional $2,500, a petition for
review to the Texas Supreme Court would be an additional $1,500, and appeal to
the Texas Supreme Court would be $2,500.[8]  In response to questions from the trial
court, McLeod testified that he was familiar with the reasonable and necessary
fees for the type of work performed, and in his opinion the fees were
reasonable and necessary. 








We have reviewed the testimony and find
that it is legally sufficient to support the trial court=s award.  See City of Keller v. Wilson, 168
S.W.3d 802, 822 (Tex. 2005) (summarizing legal sufficiency standard of
review).  It is correct that, during
cross-examination by Fidelity and Deposit Company=s counsel, McLeod
could not provide a specific breakdown of the number of hours spent on each
task and other details of the work, and he did not know if the agreement
between Arthur and Simone was hourly or a contingent fee arrangement.  However, reviewing all the evidence and
applying the Arthur Andersen factors, we cannot say that the trial court=s award of
attorney=s fees is so
against the great weight and preponderance of the evidence as to render it
factually insufficient.  See Golden
Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 761B62 (Tex. 2003)
(summarizing factual sufficiency standard of review).  We therefore hold that the trial court did
not err in awarding reasonable and necessary attorney=s fees to Simone.

William=s second issue is
overruled.

Conclusion

We sustain William=s first issue to
the extent that the trial court erred in concluding that William was required
to account for social security benefits during the time that his mother, Willie
Mae Alford, was designated the representative payee by the Social Security
Administration, and hold that the trial court erred including the amount of
those payments in the damages awarded to Simone Marino as administratrix of Mathew
Alford=s estate.  We therefore reverse that portion of the
trial court=s judgment awarding damages of $105,922.01
and reform it to award damages of $42,122.01. 
We overrule Williams=s second issue and
hold that the evidence was not legally or factually insufficient to support the
award of reasonable and necessary attorney=s fees to Simone
Marino under Probate Code section 668. 
We affirm the remainder of the trial court=s judgment.  

 

 

 

 

/s/      Wanda McKee Fowler

Justice

 

 

 

 

Judgment
rendered and Memorandum Opinion filed December 8, 2005.

Panel
consists of Justices Fowler, Edelman, and Guzman.











[1]  William does
not complain about that portion of the judgment awarding Simone $7,415.82 as a
penalty under section 758 of the Probate Code for William=s failure to timely turn over money from Mathew=s estate to the successor guardian, Tim Weaver.  





[2]  The checks
made out to cash often reflected they were for AMathew
[sic] needs.@





[3]  For example,
the last check shown for 1990 was number 1094; the next check shown in 1991 was
number 1276.  William could not explain
what happened to the over 180 checks in between, other than to say that he Apost-dated them, you know,@ and Awrote checks out of different books.@





[4]  On direct
examination by his counsel, William explained that he had cashed in the CD and
that the money from it was included in the funds turned over to Tim
Weaver.  However, the trial judge, as the
fact finder, was the sole judge of the credibility of the witness, and was free
to believe or disbelieve this testimony. 
See Barrientos, 94 S.W.3d at 288.





[5]  Mathew=s annual income was based on the following:

$310 (disability) x 12
months       =          $  3,720

$1,100 (social
security) x 12 months =     $13,200

$400 (CD interest) =                               $     400

Total Annual Income                  $17,320





[6]  This is true even after an
adjustment is made for certain social security benefits, as discussed in the
next section.  





[7]  Simone did
plead for attorney=s fees under Texas Civil Practice and Remedies Code
section 38.001, apparently relying on the existence of the surety bond
contract, and argued this basis for fees at trial.  See Tex.
Civ. Prac. & Rem. Code '
38.001(8) (providing a party may recover reasonable attorney=s fees if the claim is for an oral or written
contract).  However, because we find
Simone was entitled to attorney=s fees under section 668 of the Probate Code, we do
not address William=s argument that Simone is not entitled to attorney=s fees under section 38.001.





[8]  McLeod also
testified that he personally spent 16 hours for Awork
that [he had] performed on reviewing this file@ at a
rate of $150 per hour for a total of $2,400. 
These attorney=s fees were apparently not awarded.