# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-10-00317-CV
NO. 03-10-00558-CV

**Greg Daniels, Appellant**

**v.**

**Edith Funes, Appellee**

## FROM COUNTY COURT AT LAW NO. 4 OF WILLIAMSON COUNTY
### NOS. 09-1912-FC4 & 09-2013-FC4, HONORABLE JOHN MCMASTER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Greg Daniels appeals from the final decree in his divorce proceeding from appellee Edith Funes. Daniels also appeals from a protective order issued by the trial court during the pendency of the divorce proceeding.[1] We affirm both the divorce decree and the protective order.

## JURISDICTION

As a threshold matter, we must address the question of our jurisdiction over Daniels's appeal from the protective order. The protective order was issued on July 10, 2009, and on August 21, 2009, Daniels filed a pro se notice of appeal.[2] In appellate cause number 03-09-00505-

---

[1] The protective order proceeding and the divorce proceeding have separate cause numbers, both in the trial court and on appeal. We have consolidated the two appeals for purposes of briefing and consideration.

[2] Daniels retained counsel prior to the jury trial in the divorce proceeding.

CV, this Court dismissed Daniels's original appeal from the protective order for want of prosecution on the ground that Daniels had failed to pay or make arrangements to pay for the clerk's record. Funes takes the position that Daniels cannot now raise appellate issues related to the protective order because he has already exhausted his right to appeal that order. Daniels contends, on the other hand, that his pro se notice of appeal from the protective order was premature because the protective order remained interlocutory and unappealable until the divorce decree was issued. In support of this position, Daniels cites section 81.009 of the family code, which provides that a protective order "rendered against a party in a suit for dissolution of a marriage" may not be appealed until the divorce decree becomes a final, appealable order. Tex. Fam. Code Ann. § 81.009 (West 2008). Thus, we must determine whether the protective order at issue here was rendered "in a suit for dissolution of a marriage." *Id.*

Funes filed her application for a protective order in County Court at Law Number Four in Williamson County on June 26, 2009, under cause number 09-1912-FC4. On July 7, 2009, Funes filed her original petition, also in County Court at Law Number Four in Williamson County, under cause number 09-2013-FC4. In her original petition for divorce, Funes noted that her application for a protective order was pending. She also requested temporary orders for interim attorney's fees and spousal support. That same day, the trial court issued an order in the divorce proceeding, cause number 09-2013-FC4, setting a hearing and ordering Daniels to appear and respond to Funes's request for temporary orders *and* her application for a protective order.

On July 10, 2009, the trial court held a hearing on Funes's request for temporary orders and application for a protective order. Funes's counsel stated on the record that the hearing

2

was set for the "application for protective order and we are also set on the temporary orders for a divorce." At the conclusion of the hearing, the trial court issued the protective order in cause number 09-1912-FC4.[3] In that order, the trial court also granted temporary spousal support and attorney's fees. Daniels filed his pro se notice of appeal from the protective order on August 21, 2009.

After the protective order was issued, the parties continued to file motions related to the divorce decree in cause number 09-1912-FC4, including Funes's motion for a discovery control plan and motion for discovery sanctions. The trial court also issued its order on the discovery control plan in cause number 09-1912-FC4. At some point, Daniels began listing both cause numbers on his motions and responses related to the divorce proceeding, although the majority of these documents appear only in the clerk's record for cause number 09-1912-FC4. Daniels's counter-petition for divorce bears cause number 09-2013-FC4, but was filed in cause number 09-1912-FC4. In the midst of the jury trial on the divorce, the trial court issued a temporary injunction in cause number 09-1912-FC4, enjoining Daniels from taking any action with respect to a particular account held in his name until the parties' property division could be resolved. The divorce decree was ultimately issued in cause number 09-2013-FC4.

After the divorce decree was issued, Funes filed an application for turnover relief in cause number 09-1912-FC4, seeking to recover the amounts awarded in the divorce proceeding. Daniels's motion for new trial and the trial court's order denying the motion were filed in both cause numbers, although Funes's response to the motion was filed only in cause number 09-1912-FC4.

---

[3] The order identifies the style of the case as "In the Matter of the Marriage of Edith Funes and Greg Daniels," the same style used in cause number 09-2013-FC4.

3

Daniels's notice of appeal bears both cause numbers, but only appears in the clerk's record for cause number 09-1912-FC4.

Reviewing the records in cause numbers 09-1912-FC4 and 09-2013-FC4, we conclude that the trial court and the parties allowed the protective order proceeding and the divorce proceeding to become intertwined to such a degree that they must be treated as a single suit for purposes of family code section 81.009. Thus, we agree with Daniels that his original pro se notice of appeal was prematurely filed and that he may now appeal the protective order in connection with his appeal from the final divorce decree. *See id.*[4]

Having resolved the jurisdictional concern, we will now address the factual and procedural background giving rise to Daniels's issues on appeal.

## BACKGROUND

The parties became acquainted in June 2008, when Daniels responded to an online personal ad placed by Funes. Shortly after meeting, Funes and Daniels determined it would be mutually beneficial for Daniels to move into Funes's home. Funes was in the process of renting out rooms in her house in order to help cover her mortgage payments, while Daniels was in need of temporary housing due to mold problems and water damage in his home. Thus, in late July 2008, Daniels moved into Funes's house and began to pay rent.

---

[4] At least one other court of appeals has ruled that a protective order may not be appealed under section 81.009 in connection with a final divorce decree issued in an unrelated cause number. *See Davis v. Davis*, No. 06-07-00059-CV, 2007 Tex. App. LEXIS 4298, at *1-2 (Tex. App.—Texarkana June 1, 2007, no pet.) (mem. op.). There was no indication in *Davis*, however, that the two proceedings had become intertwined to the degree present in this case.

At some point after Daniels moved into Funes's home, the two began a dating relationship, ultimately becoming engaged in October 2008. A few weeks later, however, the parties signed a handwritten agreement that Daniels would move out of Funes's home and that Funes would return her engagement ring to him. Daniels moved out as contemplated by the agreement, but the parties later reconciled and were married on December 15, 2008. Funes testified at trial that due to problems between Daniels and her roommates, she and Daniels initially married "in secret" and continued to live in their own separate residences. Funes further testified that she and Daniels had originally planned to live in his house and use hers as a rental property, but that she allowed Daniels to move back into her house two weeks after the marriage when he claimed to have lost the keys to his home. Funes stated that Daniels continued to have problems with her roommates, eventually causing the roommates to move out.

On May 22, 2009, Funes and Daniels signed another handwritten agreement, this time stating that Daniels would move out of Funes's house by June 12. Daniels moved out on June 8, but called Funes ten days later and informed her that he would be moving back into the house. Funes testified at the protective order hearing that Daniels represented to her "that the police . . . told him that he has all the right to move back into my house because it was his marital home."[5] Believing this statement to be true, Funes left the home and went to stay with her brother. Daniels then moved back into Funes's home and changed the locks on two of the rooms.

Funes subsequently retained counsel, obtained a temporary ex parte protective order requiring Daniels to vacate the premises, and filed an application for a protective order granting her

---

[5] Daniels does not dispute that Funes purchased the home prior to the parties' marriage.

5

exclusive use of her house and prohibiting Daniels from coming near her or her residence. Daniels was removed from the home by police officers on June 29, 2009.

On July 10, 2009, the trial court held a hearing on the protective order. At the outset of the hearing, Funes's counsel stated that the hearing was set for both the protective order and the temporary orders in the divorce proceeding, but that Funes was primarily concerned with the protective order and would not be pursuing her request for temporary orders unless the court deemed it necessary.

At the hearing, Funes testified that Daniels had threatened to make her "suffer" if she ended the marriage, that she was intimidated by him because he had told her that he had a gun in his house, that he was on probation for assault, and that he had talked to her about wanting to pay to have people killed after they caused problems for him. Funes further testified that Daniels had called and emailed her repeatedly after their separation, leading her to report him to the Hutto Police Department for harassment. Funes also stated that in April 2009, Daniels had pushed her against the bed during an argument, causing her to injure her back on a metal part of the bed.

Daniels, who appeared pro se at the protective order hearing, admitted that he had told Funes that he possessed a gun, but testified that he no longer knew where the gun was located. When Daniels was asked for clarification by the trial court, the following exchange occurred:

DANIELS: I do not possess a firearm. However, before I came to Court I was going to request that the Court take the gun in custody.

COURT: The gun that you don't possess?

6

DANIELS:    Well, that I just discovered—this is what I brought today, was the empty box. It was in a closet. I had a housekeeper and this is what I found three days ago, an empty box.

COURT:    With—

DANIELS:    No gun in it.

COURT:    No gun?

DANIELS:    That's correct. And I explained to her that I don't use a gun. The last time I used this gun was 30 years ago.

Daniels provided the empty gun box to the trial court at the hearing.[6] Daniels also confirmed at the hearing that he was on probation for assault. After being advised of his rights related to self-incrimination, Daniels provided the trial court with his account of the assault that led to his probation, explaining that during a confrontation with a neighbor, the neighbor had intentionally leaned forward while Daniels was pointing at him, causing Daniels's finger to strike his eye.

With respect to Funes's testimony that Daniels had pushed her against the bed during an argument in April 2009, Daniels took the position that the injury had occurred by accident when he slipped on some pillows on the floor.[7] Daniels testified:

I stepped on one of those stupid satin pillows, I lost my footing. I instinctively flung my arms out to gain my balance, and she was standing . . . a few feet away. I hit her. She fell down, I fell down. It was a complete accident. Yes, we were arguing. I didn't hit her in anger; I hit her accidentally by me falling down and she was just standing there. And, yes, she fell down, too.

---

[6] The box, which bears the word "Colt" on it, was admitted into evidence.

[7] Funes testified that there were no pillows on the floor at the time the incident occurred.

In Daniels's cross-examination of Funes and his own testimony, which he provided in narrative form, he focused primarily on financial matters such as Funes's monthly rental income and cash amounts he had given to her for rent and to help pay her mortgage, taxes, and credit cards. The trial court explained to Daniels multiple times that these topics were not relevant to the protective order, stating, "I would be careful opening that door if I was you. Because if you start talking about her income, I might determine that she doesn't have enough of it and somebody needs to pay her some support." When Daniels continued to testify at length regarding rental payments he had made to Funes, her counsel formally requested temporary spousal support in the amount of $350 per month, which the trial court granted.

At the conclusion of the hearing, the trial court issued a protective order granting Funes exclusive use of her home and prohibiting Daniels from communicating with Funes or coming within 300 yards of her or her residence. The order also included a family-violence finding and the temporary orders requiring Daniels to pay spousal support and interim attorney's fees in the amount of $1,500.

After the protective order was issued, Daniels retained counsel and the parties proceeded with discovery in connection with the divorce action. After a number of discovery disputes, Funes filed a motion for sanctions, asserting, among other things, that Daniels had failed to provide an adequate sworn inventory and appraisement as required by the discovery control plan, which required each party to provide a sworn inventory and appraisement by November 13, 2009. After providing an incomplete and unsigned inventory and appraisement on November 20, Daniels produced a revised, signed sworn inventory and appraisement on December 8, which, according to

8

Funes, "include[d] numerous surprise additions of separate property, previously not disclosed." The most significant of these additions was a Scottrade account containing $24,628.38, which Daniels identified as his own separate property. Funes stated in her motion for sanctions that Daniels had "provided no documentation, other than the Inventory and Appraisement[,] to corroborate the existence, balance or characterization of the account as separate property."

Funes also complained that Daniels had not provided a designation of trial exhibits as required by the discovery control plan, despite the fact that he was "raising many claims of separate property which are currently unsubstantiated by the record." Funes further stated that Daniels had wholly failed to respond to her requests for production, producing no documents related to the characterization of separate or community property or to support his claims for reimbursement.[8] In addition, Funes asserted that despite her request for disclosure of the legal theories and factual bases of any asserted claims or defenses, Daniels failed to provide any statement of fact or other theory to support his separate property claims or his claims for reimbursement.

Funes requested sanctions in the form of an order precluding Daniels from offering evidence related to the characterization of community or separate property, challenging Funes's characterization of any separate or community property, or offering any exhibits outside of those included in Funes's proposed exhibit list. Funes also requested that Daniels be required to pay the attorney's fees she incurred during discovery.

---

[8] Daniels asserted claims for reimbursement for the rent payments he made to Funes prior to the parties' marriage, as well as additional amounts he claimed to have paid for Funes's credit card bills, income taxes, home improvements, and repairs to her daughter's vehicle.

After a hearing on the motion for sanctions, the trial court found that Daniels had submitted an untimely inventory and appraisement with "material and substantial changes not previously disclosed," wholly failed to respond to Funes's request for production, failed to provide any legal or factual basis for his separate property or reimbursement claims in response to Funes's request for disclosure, and failed to designate a list of exhibits as required by the discovery control plan. The trial court further found that Daniels's lack of responsiveness had needlessly injected further cost and delay into the litigation, and ordered that Daniels was precluded from offering any evidence related to the characterization of the community or separate estate beyond that provided by Funes, from producing any exhibits outside of those included in Funes's proposed exhibit list, and from challenging Funes's characterization of any separate or community property. The court also struck the allegation of mental cruelty from Daniels's counter-petition for divorce, struck his claims for reimbursement, and ordered Daniels to pay Funes $1,800 in attorney's fees.

In January 2010, a two-day jury trial was held on the parties' divorce.[9] After hearing all of the evidence, the jury found that the marriage was insupportable and that there were grounds for divorce on the basis of Daniels's cruel treatment of Funes. The jury further found that Funes reasonably and necessarily incurred $11,000 in attorney's fees through trial and would incur $7,500 in fees in an appeal to this Court and $5,000 in an appeal to the Texas Supreme Court. In light of the sanctions order precluding Daniels from challenging Funes's characterization of separate and community property, no questions related to marital property were submitted to the jury.

---

[9] At the conclusion of the first day of trial, the trial court issued a temporary injunction preventing Daniels from taking any action with respect to the funds in the Scottrade account.

The trial court then issued the final decree of divorce. With respect to the property division, Funes had stipulated that certain items, including Daniels' home, represented his separate property, but characterized the Scottrade account as community property. The divorce decree included an express finding that a disproportionate award of the estate was justified due to "(a) fault in the break-up of the marriage; (b) cruel treatment committed against Edith Funes; and [(c)] attorney's fees to be paid." The trial court awarded each party the household furniture and personal effects in that party's possession or sole control and confirmed each party's respective residence as their own separate property. In dividing the community property, the trial court awarded Funes 100% of the Scottrade account balance, finding that "the Scottrade Account had a balance of at least $50,000 or more as of November 2009 and that at the time of Divorce the balance was approximately $24,000 and that the award of the balance of the account is a just and right division of approximately ½ of the account on the date of Divorce."[10] Finally, the trial court awarded Funes attorney's fees in the amounts found reasonable and necessary by the jury.[11]

---

[10] Funes presented evidence at trial that Daniels had transferred $23,218.97 from the Scottrade account to the Travis County District Clerk's Office in November 2009 in order to pay an appeal bond in an unrelated case.

[11] The divorce decree provides that Funes would be awarded $7,500 in attorney's fees for her representation "through the [Third] Court of Appeals in the event of a successful appeal, and $5,000 as attorney's fees for the legal services of Counsel to represent Edith Funes through the [Texas Supreme Court]." We will presume that the award for an appeal to the Texas Supreme Court, like the award for an appeal to this Court, is conditioned on a successful appeal. Unconditional appellate fees are improper, so such a condition is necessarily implied. *See Solomon v. Steitler*, 312 S.W.3d 46, 59-60 (Tex. App.—Texarkana 2010, no pet.); *see also Houston Livestock Show & Rodeo, Inc. v. Hamrick*, 125 S.W.3d 555, 586 (Tex. App.—Austin 2003, no pet.); *Westech Eng'g Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 205 (Tex. App.—Austin 1992, no writ).

Daniels's motion for new trial was denied, and this appeal followed. In four issues on appeal, Daniels argues that (1) the trial court abused its discretion in granting Funes's motion for sanctions, (2) the protective order was based on legally and factually insufficient evidence, (3) the bias and partiality shown by the trial court requires a new trial, and (4) Funes should be sanctioned for misstatements in certain documents filed with the trial court.[12]

## STANDARD OF REVIEW

A trial court's ruling on a motion for sanctions is reviewed for an abuse of discretion. *Cire v. Cummings*, 134 S.W.3d 835, 838 (Tex. 2004). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). "The mere fact that a trial judge may decide a matter within his discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred." *Id.*

A legal-sufficiency challenge to a protective order, like any other legal-sufficiency challenge, may only be sustained when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than

---

[12] Daniels initially raised a fifth issue on appeal related to the temporary order granting spousal support, but concedes in his reply brief that temporary orders are not reviewable on appeal. *See* Tex. Fam. Code Ann. § 6.507 (West 2006); *Herschberg v. Herschberg*, 994 S.W.2d 273, 276 (Tex. App.—Corpus Christi 1999, pet. denied); *see also Beard v. Beard*, 49 S.W.3d 40, 69 (Tex. App.—Waco 2001, pet. denied) (observing that temporary orders are interlocutory in character and are supplanted by terms of final divorce decree).

a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *See Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable fact-finder could, and disregard evidence contrary to the finding unless a reasonable fact-finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).

In reviewing a finding for factual sufficiency, we weigh all of the evidence in the record and set aside the challenged finding only if it is so contrary to the overwhelming weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). The trier of fact is the sole judge of the weight and credibility of the witnesses' testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

In order to reverse a judgment based on improper conduct or comments by the trial court, we must find "that judicial impropriety was in fact committed and the complaining party was probably prejudiced." *Barrientos v. Nava*, 94 S.W.3d 270, 291 (Tex. App.—Houston [14th Dist.] 2002, no pet.). Critical, disapproving, or even hostile remarks may "constitute bias only if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Id.* at 291-92.

## DISCUSSION

*Discovery Sanctions*

In his first issue on appeal, Daniels contends that the trial court abused its discretion in granting Funes's motion for discovery sanctions because the sanctions imposed were

13

unnecessarily severe. *See TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991) (holding that "a sanction imposed for discovery abuse should be no more severe than necessary to satisfy its legitimate purposes" and that "courts must consider the availability of less stringent sanctions and whether such lesser sanctions would fully promote compliance").

Texas Rule of Civil Procedure 193.6 states that a "party who fails to make, amend, or supplement a discovery response in a timely manner may not introduce in evidence the material or information that was not timely disclosed" in the absence of good cause and a finding by the trial court that the failure to make, amend, or supplement the response "will not unfairly surprise or unfairly prejudice the other parties." Tex. R. Civ. P. 193.6(a). The burden of establishing good cause or the lack of unfair surprise or unfair prejudice is on the party seeking to introduce the evidence. Tex. R. Civ. P. 193.6(b).

As previously stated, Daniels wholly failed to respond to Funes's requests for production, producing no documents to support his claims for reimbursement or the characterization of any property, including the Scottrade account, as his own separate property.[13] Further, despite Funes's request for disclosure of the legal theories and factual bases of any asserted claims or defenses, Daniels failed to disclose any statement of fact or legal theory to support his separate property claims or his claims for reimbursement.

---

[13] The Scottrade account appears to be the only marital asset in dispute, as Daniels does not otherwise challenge the inventory produced by Funes and relied upon by the trial court in performing the property division. This inventory characterized Daniels's residence and other real property as his separate property.

With respect to the Scottrade account, Daniels failed to disclose its existence at all in his initial inventory and appraisement, including it for the first time in an amended inventory and appraisement filed 25 days after the deadline provided by the discovery control plan.[14] Daniels asserts on appeal that Funes could not have been surprised or unfairly prejudiced by the late disclosure of the Scottrade account because she admitted on the stand that she knew the account existed on the day the parties were married. This is a misrepresentation of Funes's trial testimony. Funes did not, in fact, testify that she knew Daniels had a Scottrade account in his name at the time of the marriage. Rather, she testified that when she married Daniels, she knew he was a "day trader" because she saw him "look[] at stock every day in the computer and he was angry because the stock wasn't good and sometimes he makes money." At no point did she testify to specific knowledge of the existence of any particular account, Scottrade or otherwise. At any rate, even if the late disclosure of the account's existence did not unfairly prejudice Funes, Daniels failed to produce any documentation with respect to the separate property nature of the account, an issue that he had the burden to prove. *See* Tex. Fam. Code Ann. § 3.003 (West 2006) (property possessed by either spouse on dissolution of marriage is presumed to be community property); *Pearson v. Fillingim*, 332 S.W.3d 361, 363 (Tex. 2011) (stating that parties claiming property as their separate property have burden of rebutting community property presumption by tracing and clearly identifying property as separate by clear and convincing evidence). Without any documentation related to the account

---

[14] We note that the initial inventory and appraisement was accompanied by an email stating that it was a "preliminary copy" and that a sworn copy would be forthcoming. The email does not suggest, however, that the sworn copy would also include additional assets not previously disclosed.

15

or any knowledge of Daniels's theory as to why the account was his separate property, Funes would be surprised and unfairly prejudiced in responding to this claim at trial.

In light of Daniels's failure to produce any documentation to support his separate property or reimbursement claims, as well as his failure to respond to requests for disclosure by providing any legal or factual bases for these claims, we hold that the trial court did not abuse its discretion in granting the motion for sanctions and precluding Daniels from introducing evidence in support of these claims at trial. *See* Tex. R. Civ. P. 193.6(b). We overrule Daniels's first issue on appeal.[15]

*Protective Order*

In his second issue, Daniels argues that the protective order was based on factually and legally insufficient evidence. Family code section 85.001 provides that a trial court may render a protective order after finding that family violence has occurred and is likely to occur in the future. Tex. Fam. Code Ann. § 85.001 (West 2008); *see also id.* § 85.021 (West 2008) (protective order may grant exclusive possession of residence to one party and direct other parties to vacate the residence, if necessary). The protective order in this case includes an express finding that Daniels had committed family violence and that family violence was likely to occur in the future.

---

[15] Daniels does not raise a separate challenge to the striking of his pleading that Funes was "guilty of cold hearted cruelty." The trial court clarified at trial that the mental cruelty claim was stricken in order to avoid letting the trial "degenerate into a spectacle . . . in front of six jurors where someone who is angry vents their anger for no legitimate purpose." Given the nature of Daniels's testimony in the protective order hearing, we conclude that this concern was warranted and that the trial court did not abuse its discretion in striking the claim.

16

The evidence presented at the protective order hearing included Funes's testimony that Daniels had pushed her during an argument in April 2009, causing her to fall against the bed and injure her back. Daniels, acknowledging that the incident had occurred during an argument, testified that he had merely slipped on some pillows on the floor while arguing with Funes and accidentally caused her to fall. As the trier of fact, the trial court was free to believe Funes's testimony and disbelieve Daniels's version of the incident. *See Golden Eagle Archery*, 116 S.W.3d at 761 (stating that trier of fact is sole judge of credibility of witnesses and weight to be given their testimony). Funes's testimony represents more than a scintilla of evidence that family violence had occurred. *See Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2002) ("If more than a scintilla of evidence exists, it is legally sufficient."). Further, considering Funes's and Daniels's conflicting accounts of the incident and the trial court's role in weighing the credibility of witnesses, the family-violence finding is not so contrary to the overwhelming weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *See Ortiz*, 917 S.W.2d at 772.

With respect to the likelihood that family violence would occur in the future, the trial court heard Funes's testimony that she was intimidated by Daniels, that he had told her he owned a gun, that he was on probation for assault, and that he had talked about wanting to pay to have people killed. Daniels admitted to having told Funes that he owned a gun, going so far as to bring the empty gun box into the courtroom, explaining that he had originally planned to turn over the gun to the trial court before discovering that it was no longer in the box. Daniels also admitted that he was on probation for assault, but characterized the assault as a "set-up" by his neighbor.

17

With respect to Funes's testimony that Daniels had talked about paying to have people killed, Daniels took the position that Funes had become confused after hearing a story about how he had been accused of attempting to bribe a witness in his assault case. Daniels testified:

> I was telling this story of how this happened. They accused me of paying this guy off by taking a car and giving him money for it but never registering it. Well, I bought a car for him, I just never registered it. But it wasn't a bribe, it was like three years earlier that this happened. The point was, Ms. Funes has confused all the things that I was telling her.

Again, the trial court was free to reconcile the conflicts in the evidence by believing Funes's testimony and disregarding Daniels's contention that Funes had become confused by an unrelated story about a bribe.

The trial court was also presented with a video recording taken by Funes after Daniels had moved out of her home. Funes testified that the police had advised her to videotape Daniels retrieving his belongings from her garage, in order to refute later claims that he had not retrieved certain items. The video, which is included in the appellate record, depicts Funes walking out to the driveway, but running back into the house after being approached by Daniels. As Funes retreats to the house, Daniels can be heard saying, "Yeah, you better run."

Funes also testified that Daniels threatened to make her "suffer" if she ended the marriage. Daniels himself emphasized during his cross-examination of Funes that he had told her she would "suffer the consequences" if she "refused to be reasonable" with him. Daniels cross-examined Funes as follows:

DANIELS: You remember me telling you that if you continued to lie and cheat, that you will suffer consequences?

FUNES: Probably. I don't remember.

DANIELS: You remember that I told you that if you refused to be reasonable with me, that you will suffer the consequences?

FUNES: Yeah.

DANIELS: You remember that I also told you if you always insist on getting your own way, that our relationship will suffer the consequences?

FUNES: Probably.

On appeal, Daniels attempts to draw a distinction between telling Funes that she would "suffer" and telling her that she would "suffer the consequences." He takes the position that Funes misrepresented his statement to the court by saying only that he told her she would "suffer" if she attempted to end the marriage. We fail to see any meaningful distinction between a statement that Funes would "suffer" if she ended the marriage and a statement that she would "suffer the consequences" if she "refused to be reasonable." Both statements imply a threat of future violence, particularly in light of the other facts presented at the hearing. While Daniels points out that in one remark he merely stated that the couple's relationship would "suffer the consequences" if Funes insisted on "getting [her] own way," he also, by his own admission, told Funes that she herself would "suffer the consequences" if she refused to be reasonable with him.

Daniels contends that Funes was not a credible witness, emphasizing a statement in the affidavit in support of her application for a protective order in which she states that she "begged [Daniels] to attempt marriage counseling." When Daniels questioned her about this statement at the

19

hearing, Funes acknowledged that it was incorrect, stating, "I don't know what happened. And when they bring the affidavit maybe get confused with another case. But, no, it was you that want[ed] to go to the counseling, not me." It appears from Funes's testimony that she was confused about how the incorrect statement had been included in the affidavit, but she does not appear to have been attempting to mislead the court, as she readily testified that it was Daniels who requested that the parties attend marriage counseling. In any event, the question of which party sought to attend marriage counseling is irrelevant to the family-violence finding. Daniels made it abundantly clear at the protective order hearing that Funes sought a divorce over his objection, but that fact has no bearing on whether family violence had occurred or was likely to occur in the future.[16]

Given Daniels's threats to make Funes "suffer the consequences" for various reasons, his threatening statement on the video that Funes "better run," the fact that he had committed family violence in the past, and the testimony that Daniels was on probation for assault, talked of having people killed, and represented to Funes that he owned a gun, we conclude that there is legally and factually sufficient evidence to support the trial court's finding that family violence was likely to occur in the future.

Because the evidence was sufficient to support the findings that family violence had occurred and was likely to occur in the future, the trial court did not err in issuing the protective order. Daniels's second issue is overruled.

---

[16] To the extent Daniels's reluctance to end the marriage could have any relevance to the family-violence finding, it would be as support for Funes's testimony that the April 2009 pushing incident occurred after she told Daniels that she no longer wanted to be married to him.

*Bias*

In a third issue on appeal, Daniels argues that the protective order and divorce decree should be reversed because the trial court exhibited bias and partiality against him, depriving him of a fair trial. Daniels's argument of bias is based on the following exchange during Daniels's pro se cross-examination of Funes at the protective order hearing:

DANIELS: You indicated that you had purchased this house in November of 2007, and it was entirely purchased. I believe you had told me that you did not put any money down on this house. Is that correct?

FUNES: No. I put like $700.

DANIELS: Wasn't that closing costs that you paid? That wasn't money actually in escrow—I mean, it wasn't money for the house?

THE COURT: Counsel, do you wish to make an objection in regards to relevance?

Funes's COUNSEL: I was going to say, judge, I don't believe that's relevant.

Daniels takes the position that by suggesting a relevancy objection to Funes's attorney, the trial court improperly advocated on Funes's behalf.

To place this incident in context, the trial court here was dealing with a pro se litigant cross-examining a party who was currently seeking a protective order against him based, in part, on allegations of family violence. The question of whether Funes made a $700 down payment on a home purchased over a year before the parties' marriage was not even remotely relevant to the issues surrounding the protective order or the temporary orders for spousal support and interim attorney's

21

fees.[17] Because the testimony Daniels sought to elicit could have had no effect on whether Funes was entitled to a protective order or the requested temporary orders, there is no indication that Daniels was prejudiced by the trial court's statement. *See Barrientos*, 94 S.W.3d at 291 (holding that complaining party must establish probable prejudice in order to obtain reversal based on judicial impropriety). The lack of probable prejudice is further reflected by the fact that Funes's counsel indicated that he had been preparing to object on relevancy grounds before the trial court raised the issue.

We also conclude, based on the context of the hearing, that the trial court did not suggest the objection in order to advocate on Funes's behalf, but rather to protect a witness in a family-violence protective order proceeding from an unnecessary line of questioning from a hostile pro se litigant. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) ("[A] trial court may properly intervene to maintain control in the courtroom, to expedite the trial, and to prevent what it considers to be a waste of time."). Immediately prior to the line of questioning regarding Funes's $700 payment towards her home, Daniels questioned Funes in what could be considered a threatening manner, asking her in three different ways if she remembered his past threats to make her suffer consequences. Daniels then asked Funes whether she understood his questions and requested that she define the word "consequences," explaining to the trial court, "I would like to find

---

[17] It is unclear precisely what Daniels intended to establish with respect to the down payment, but it appears that he may have been laying the predicate for his subsequent argument that in light of his financial contributions to Funes's mortgage payments and utilities, he was entitled to an order from the trial court stating that he had a right to live in her house. This request was denied by the trial court.

out if she does understand what the word consequences means."[18]  Given Daniels's pro se status and demonstrated tendency to stray from the issues at hand in order to harass Funes on the stand, we cannot say that the trial court acted improperly or demonstrated improper bias by attempting to steer Daniels back to a relevant line of questioning.[19]  *See id.* at 240 ("[A] trial court has the inherent power to control the disposition of cases 'with economy of time and effort for itself, for counsel, and for litigants.'") (quoting *Landis v. North Am. Co.*, 299 U.S. 248, 254 (1936)).  Daniels's third issue is overruled.

*Request for Sanctions*

In his fourth and final issue on appeal, Daniels contends that Funes should be sanctioned for making fraudulent statements in her protective order affidavit and other trial court pleadings.  This request was never made to the trial court and is therefore waived.  *See* Tex. R. App. P. 33.1(a).  While Daniels argues that he was prevented from presenting his request for sanctions to the trial court in light of the discovery sanctions against him, he cites to no authority to suggest, nor does he adequately explain, how the sanctions order prevented him from filing a motion for sanctions against Funes for filing what he claims were fraudulent pleadings.  *See* Tex. R. Civ. P. 13; Tex. Civ.

---

[18]  Funes indicated at the protective order hearing that English is not her first language.

[19]  To the extent Daniels also complains that the temporary orders for spousal support reflect the trial court's bias against him, we note that the trial court repeatedly warned Daniels throughout the hearing that support would be awarded if Daniels persisted in injecting irrelevant financial matters into the protective order hearing.  When Daniels then proceeded to testify at length about the value of the engagement ring he purchased for Funes, her monthly rental income, and the funds he put toward her mortgage payments, the trial court granted an award of temporary spousal support in the amount of $350 per month.  Given the trial court's clear instructions and Daniels's decision to ignore them, we see no bias or partiality in the trial court's decision to grant the temporary orders for spousal support.

23

Prac. & Rem. Code Ann. § 10.002 (West 2002).  Because this issue has not been properly preserved for appellate review, it is overruled.

## CONCLUSION

Having overruled all of Daniels's points of error on appeal, we affirm both the protective order and the final decree of divorce.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Henson and Goodwin

Affirmed

Filed:   June 17, 2011